# J. W. THOMPSON AND WILLIAM THOMPSON
## vs.
# GEORGE W. RIGGS ET AL.*

1. The liability of a banker who receives deposits of money, to pay out the same on the checks of the depositor is implied by law and does not require any special contract.
2. The relation of a banker to his depositor is that of a debtor to a creditor and not that of a bailor, agent or trustee.
3. Where there is a special contract, its terms define all the rights and liabilities of the parties, and evidence of custom or usage cannot be received to vary or affect those terms.
4. So, where the liability of a party is fixed and clear under the law, evidence of usage is irrelevant since it can neither confirm, detract from, nor in any way effect such liability.
5. Where the parties have agreed upon a particular place where a contract, the terms of which are doubtful, is to be performed, the usage of that place may be given in evidence for the purpose of interpreting the contract.
6. The Act of Congress of February 25, 1869, ("The legal tender Act") and the subsequent Acts containing similar provisions, apply to ordinary bank deposits, and a tender of Treasury notes in payment of a check, drawn by a depositor, whose only deposits had been made before the passage of the Act and in gold coin, is a legal tender notwithstanding that the bank prior to the Act had always paid such checks in gold coin.
7. Legislative Acts are not to be pronounced unconstitutional on slight implication and vague conjecture, the opposition between the Constitution and the Act in question should be such as to lead the Court to a clear and strong conclusion of their incompatibility with each other.
8. The Acts of Congress known as the "Legal-tender Acts" are not unconstitutional.

Law No. 922.  Decided Nov. 7, 1864.

MOTION for a new trial on exceptions.

THE FACTS are stated in the opinion.

MESSRS. JOSEPH H. BRADLEY and NATHANIEL WILSON, for plaintiff:

The Court erred in refusing to allow us to prove the averments of the declaration, and rejected evidence from which,

---

* Affirmed by the Supreme Court of the United States, see Thompson vs. Riggs, 5 Wall., 663.

unaided by express stipulation, the jury might have found, and the law inferred, an obligation to return specie deposits in kind.

The uniform custom of banks in the District of Columbia, constitute a part of the contract between bankers and depositors. Renner vs. Bank of Columbia, .9 Wheat., 582; 1 Sm. Lead. Cas., 679; 1 Pars. Cont., 48, 49.

The Court erred in granting the instruction asked by the defendants. Neither the letter nor the policy of the legal tender acts affects a contract such as that set out in the record. Metr. Bank vs. Van Dyck, 27 N. Y., 400; Schoenberg vs. Watts, District Court of Philadelphia, 1 Am. Law Reg., 553; Wood vs. Bullens, 6 Allen (Mass.), 516; Buchyger vs. Schultz, 5 Am. Law Reg., 95; Carpenter vs. Atherton, 21 Am. Law Reg., 225, Feb., 1865; Barrington vs. Potter, 1 Dyer, 81 a; 20 Vin., ab. 177, 178; Pong vs. Lindsey, 1 Dyer, 82 a; Robinson vs. Noble, 8 Pet., 181; Faw vs. Marsteller, 2 Cranch., 30.

MESSRS. J. M. CARLISLE and W. S. Cox, for defendant in error.

The second instruction asked by the plaintiffs proceeds upon the idea of an express and special contract; that is, a contract to do some thing special, as distinct from a mere promise to pay a money debt; the object being to except this case from the operation of the act of February 25, 1862, upon all debts. The instruction was properly refused, because there was no evidence of any such contract. There was no express contract or promise of any sort. There was nothing expressed but the acknowledgment of the receipt or deposit of certain moneys to the credit of the depositors, and no express promise to pay it at any time or in any manner. Story Prom. N., sec. 14; Grant, Banking, 2, 3.

Even if an express contract could be proved to return these specie deposits in kind, as averred in the declaration, still it was not a contract to deliver so much bullion, but a

promise to pay so much money. The money deposited was not to be returned, but an equivalent amount in dollars and cents to be repaid. Nothing can be made out of this but a mere money debt, and, therefore, the Court was right in instructing the jury, according to the prayer of the defendants, that even if they found that the coin was deposited with the defendants as bankers, to be repaid in coin, this merely created a debt which could be discharged in legal tender notes.

On this point see Shallenberger *vs.* Brenton, 3 Am. Law Reg. (U. S.), 59; Schoenberger *vs.* Watts, 1 Am. Law Reg. (U. S.), 553; Warmbold *vs.* Schlicting, 16 Ia., 243; Wood *vs.* Bullens, 6 Allen (Mass.), 516; Appel *vs.* Woltman, 6 Am. Law Reg. (U. S.), 248, reported, 38 Mo., 194; Buchyger *vs.* Schultz, 5 Am. Law Reg. (U. S.), 95.

The plaintiff, at the trial, relied upon evidence of the usage of the bank of the defendants, after the suspension of specie payment by the United States in January 1862, and especially after the act of February 25, 1862, in repaying specie and currency deposits in kind and offered evidence of a similar usage on the part of other banks, which was refused; and this refusal was the ground of the first exception.

A usage or custom is referred to, either as the law governing the dealings between parties, or in order to ascertain their presumed intention.

But in either case it can only be resorted to where the contract and the statute law are silent. No usuage can exist in opposition to the statute, nor is there such a thing as an usage coincident with the statute which in fact consists merely of obedience to the statute.

Where the statute prescribes a rule of action the obligation as well as the meaning of the parties is referred to and ascertained by the statute.

Wigglesworth *vs.* Dallison, 1 S. M. Lead, Cas., 670 (Doug.

201); Renner *vs.* Bank of Columbia, 9 Wheat., 582; Camden *vs.* Doremus, 3 How., 515.

It will be maintained that this act was within the power of Congress conferred by article 1, section 8, of Constitution.

It is settled, that in the choice of means to carry into effect its powers expressly granted, Congress is not restricted to those which are absolutely essential, but may select those which are useful or conducive to the end, or calculated to effect the object, and Congress is the sole judge of the degree of necessity or expediency. McCulloch *vs.* Md., 4 Wheat., 316; U. S. *vs.* Fisher, 2 Cranch, 358; Craig *vs.* Md., 4 Pet., 4, 10; Buscoe *vs.* Bank of Ky., 11 Pet., 257 and 13 How., 12.

It has been decided that treasury notes may be made a lawful tender in payment of debts to the United States. Thorndike *vs.* U. S., 2 Mass., 1, 18.

It has been decided that Congress under the power to borrow money, may declare United States stocks and securities exempt from taxation in order to add to their value.

Mr. Justice Wylie delivered the opinion of the Court:

At the trial of this cause in the Circuit Court, a verdict was found in favor of the defendants. Plaintiffs entered a motion for a new trial, on the ground that the instructions given to the jury by the justice before whom the case was tried were erroneous in law. This motion was certified to this Court, has been fully and ably argued, and is now to be decided.

The several bills of exceptions contain the whole evidence, and the material and undisputed facts are as follows:

Defendants were, and still are private bankers, doing a large business in the city of Washington, with whom plaintiffs kept their account in the year 1861, and subsequently until the rise of the present controversy between the parties. In the spring of 1861, defendants were in the habit of re-

ceiving on deposit, from their customers, two kinds of currency, one specie or its equivalent, and the other depreciated bank paper of Virginia and other banks. As yet, Treasury notes had not been issued, and specie was the standard. The accounts kept with plaintiffs, as well as with other customers of the bank, all discriminated between these two kinds of currency. Deposits made in specie funds were paid in specie, and deposits made in depreciated paper were paid in depreciated paper.

The war broke out in April, 1861, and the bank paper, which was already below par, soon depreciated still further.

On the 18th of June, 1861, plaintiffs had their accounts settled, showing a balance in their favor at defendants' bank of $2,920 in specie and $2,463.50 in depreciated funds.

Defendants then gave notice to plaintiffs that the account in depreciated paper must be closed, and that thereafter but one account would be kept, namely, that on the specie basis. Between this date and the 3rd of September following plaintiffs withdrew from deposit all their depreciated funds substituting specie deposits in their place, in pursuance of the notice above referred to, so that on this last date, and from that time forward the account between the parties was wholly a specie account.

The deposits made, however, were not always, nor even in the majority of cases, the actual specie consisting of the precious metals; but were frequently in drafts or other funds, which were regarded as equivalent to specie.

Thus the account continued to run between the parties, plaintiffs making their deposits in specie or its equivalent, and checking for specie or its equivalent as suited their convenience.

On or about the 31st of December, 1861, the United States Treasury suspended specie payment, which was immediately followed by a similar suspension by all the banks of the country.

The checks, however, drawn by the plaintiffs on the de-

fendants were still payable, and were paid in specie, not-withstanding this universal suspension of specie payments, in which the Government, from necessity had taken the lead. But on the 25th of February, 1862, an act of Congress was passed, which provided for an issue of $150,000,000 of Treasury notes, and made them "lawful money and legal tender in payment of all debts, public and private, within the United States, except duties on imports and interest as aforesaid."

Soon after the passage of this act, plaintiffs made a small deposit of coin with defendants, but as its amount was more than paid in coin on a subsequent check of plaintiffs, that fact may be laid out of view in our consideration of this case.

On the 8th of May, 1862, plaintiffs had to their credit in defendants' bank the sum of $7,350, for which they drew two checks, one for $750 and the other for $6,600.

This evidence given in this cause does not show that either of these checks was presented for payment until the 23d of February, 1864, almost two years after their date, when both were presented, and payment demanded in gold. This was refused by defendants, who, however, made a formal tender of the amount in the legal tender notes of the Treasury, which plaintiffs refused to accept, insisting upon their right to be paid in gold.

The foregoing is a history of the facts, so far as the record shows, out of which the present controversy has arisen.

Plaintiffs have declared on a special contract which they say is established by these facts, and binds the defendants to pay them the whole amount of their claim in gold coin. Defendants have pleaded *non assumpsit*, by which they deny that any such special contract was ever entered into between the parties, and have also pleaded a tender of payment in the legal-tender notes of the Government, the refusal of the same by the plaintiffs and with leave have paid the same into Court.

It is wholly unnecessary, in my judgment, to decide in this case whether a tender of payment in Treasury notes would have been good if there had been a special contract entered into in the summer of 1861 between the parties that the debt due from the defendants to the plaintiffs should be paid in specie.

The terms of contract, relation of the parties in their dealings, and all their conduct touching the present controversy are clearly set forth in the record before us, and, in my judgment, there was no such thing as a special contract between them.

If there was such special contract, however, that would not, in my opinion, change the result.

Prior to the Act of 25th February, 1862, above referred to, all debts were payable in gold or silver, whether so expressed in the contract or not. It required a special contract to alter this obligation. Parties might agree to make payment in something else than gold and silver. But in the absence of a special contract, the law declared that nothing should be a legal tender except gold or silver coin. A special contract to pay a debt in gold or silver coin added nothing whatever to the contract. It might have been struck out of the contract, and the obligation would still have remained unaffected by the alteration. But a contract to pay in depreciated currency, like a contract to deliver so much merchandise or other property, would be a special contract.

So in the present controversy, so long as there were two distinct accounts kept by the plaintiffs with the defendants, one for specie and the other for depreciated paper, the special contract had reference only to this latter account, and not to the former. When the latter account was closed and settled, the parties were left with but one account between them, and that was an account differing in no single particular from any other account kept by these defendants,

*14*

as bankers with any of their customers, in the usual manner receiving deposits in specie and paying out the same on the checks of the customer.

This liability of a banker to his customer has never been held to arise out of special contract. The liability is implied by the law, because it would be unjust to permit the banker to retain the money for which he had rendered no consideration to its owner. It is like a thousand other liabilities which arise out of the daily transactions of life, in regard to which the parties have made no formal special agreements, but which are implied by the law because it will not permit men to defraud one another if it can prevent it.

And, although it is common to say that money left in bank is deposited, we must be careful not to be led into error by that term.

Money deposited in bank may be used in the business of the bank. The bank is not bound to keep it as the property of the customer. When left there, it passes at once into and is mingled with the mass of other funds in the bank. It becomes the property of the bank. The depositor is no longer its owner. All that he gets and all that the law allows him to get, is a credit at the bank for the amount of his deposit. The banker owes him that much money, because the customer has left that much in his hands to be used as the former pleases. The banker is neither the bailee of the customer, nor is he the agent or trustee of the customer. The only relation between them is that of debtor and creditor, and the only obligation is that implied by the law, from the fact of the deposit of money. See Grant on Banking, pp. 3, &c.; Maczetti *vs.* Williams, 1 B. & Ad., 415; Comyn. on Con., 5, 6.

We have in the present controversy, therefore, the case of a debt owing and due from one party to another, and arising out of an implied contract, many months anterior to the passage of the law making Treasury notes a lawful

tender in payment of debts, and differing in no particular from any other implied contract of that date for the payment of money.

But in order to strengthen their claim, plaintiffs offered evidence to show that during the whole period of time covered by their account, up to the date of the suspension of specie payments by the Treasury Department, on the 31st of December, 1881, it was the usage of defendants to pay the checks of their customers in specie, when the deposits had been made in specie.

This evidence was not objected to by defendants' counsel, and was therefore received. But in what respect it could fortify their present claim, I am at a loss to comprehend.

It is not disputed that prior to the passage of the Act of 25th of February, 1862, defendants were bound by law to pay their debts in gold or silver coin. The evidence showed nothing more than that it was the usage of the defendants, at that time, to do precisely what the law required at that time.

After the reception of this evidence without objection, plaintiffs then offered to prove that the same usage prevailed, at the same time, with the other banks of the city. But objection was made to the admission of this evidence, and the objection sustained by the Circuit Court; to which decision of the Court exception was taken by plaintiff's counsel.

If there was a special contract in this case between the parties, as alleged in the declaration, then the terms of the contract defined all the rights and liabilities of the parties respectively, and the usage of other banks, whatever it may have been, could not be shown to vary or affect such special contract.

If there was no such special contract, then the evidence offered amounted to nothing more than to show that other banks obeyed the law by paying their creditors in specie, just as the defendants were doing at the same time. Sup-

pose the other banks had not been paying their depositors in coin during this period, could that usage have been admitted as evidence in this case on behalf of the defendants? Certainly not; and why?

Because the liability of the defendants to the plaintiffs was fixed and established by the law. That law obliged the defendants to pay in gold or silver, and proof of usage could neither confirm, detract from, nor in any way affect the rights or liabilities of the parties. There was no controversy that prior to the passage of the Act of 25th February, 1862, defendants were bound by law to pay plaintiffs' checks in gold and silver coin. The evidence offered was to prove that other parties actually did pay their debts in gold and silver coin at that time, as they also were bound to do. The question here is whether defendants are bound to pay their debts in gold or silver coin since the passage of that act.

To my mind the question raised by this bill of exceptions is altogether too plain to require further examination. But before dismissing the subject I will refer to the case of Renner *vs.* The Bank of Columbia, for a clear exposition of the law of the subject of usage in the interpretation of contracts.

When the parties have agreed upon a particular place where their contract is to be performed, the usage of that place will influence the construction of the contract on the principle of *lex loci*. For example, if the contract is to be carried into effect in some named city, then, if its terms be doubtful, evidence of usage in that city is admissible for its interpretation. On the same principle, if the contract is to be performed at some particular bank, then the usage at that bank would be evidence in a proper case.

In the case under consideration the contract, whether we regard it as express or implied, was to be performed at the defendant's bank and nowhere else.

On this ground, also, the evidence offered was properly excluded by the Court.

The next question to be considered is whether the act of 25th of February, 1862, making treasury notes a legal tender in payment of debts, and the subsequent acts of Congresss containing similar provisions are applicable to the case before us.

These acts apply to all debts, whether public or private.

It has been argued in this case that the tender of treasury notes was not a legal tender, because the plaintiffs have sued on a special contract for the recovery of damages, and not of a debt.

A debt is a sum certain due from one man to another.

The sum due in the present instance is absolutely certain, and the action of debt might have been sustained for its recovery. The plaintiffs have not thought proper to sue in debt, but in assumpsit claiming that a special contract was entered into between them and the defendants for the payment of so much money in gold coin which the latter refused to pay, and claim damages for breach of this contract.

Now assumpsit and covenant and case may, one or the other, be brought for the recovery of by far the larger number of debts due amongst the members of a community. A promissory note may be made with parties named and certain, date and payment certain, and amount payable certain to a fraction. According to this theory of the act of Congress, if plaintiff should happen to sue in debt on the note defendant may defeat his recovery by proving tender of the debt and paying money into court in treasury notes. But if he have been sharp enough to sue for damages in an action of assumpsit upon the same note, he can force the defendant to pay in gold or silver coin.

Let us examine this theory a little further as to its practical consequences.

It is claimed that the Act of Congress does not embrace

claims for damages. Take it to be so. You sue in assumpsit to recover a debt in the shape of damages. The Act of Congress does not apply to the case. The debt is a certain fixed sum and your verdict and judgment are for that sum with interest and no more. By the rules of law it cannot be any more. But since it is sued for as damages, the Act of Congress does not apply. You get your verdict and your judgment, and what then? Your claim is no longer a claim for damages, but is settled into the fixed and unbending limitations of a judgment. A judgment as a debt, and the defendant at last comes out victor and passes to the marshal this claim of plaintiffs' for damages which the crucible of the law has restored to its original form of a simple debt, in the legal tender notes of the United States.

I cannot believe that the Congress of the United States, in act after act recently passed, have committed so absurd a blunder as to permit a plaintiff to defeat the intent of the law by simply changing the form of his action for the recovery of his debt from an action of debt to an action for the recovery of the same debt in the shape of damages, to be followed by such a result as that just stated.

In the present case the demand is liquidated and certain. Plaintiffs themselves have given in evidence their bank book, showing the defendant's admission of the exact amount which they claim, and besides have proved their own demand of that precise sum made at defendant's bank.

If the act of Congress does not apply to a case like this, it is a stupid disgrace in the legislation of the country, and its operation nugatory—an absurdity not for a moment to be entertained or further debated.

The last and most important question involved in this case is that as to the constitutional power of Congress to make and declare Treasury notes a lawful tender in payment of debts. The duty of deciding a great question like this is one of the utmost delicacy and importance. But, as

it lies directly before us, and is not to be avoided, it cannot be regarded as usurpation on the part of the Court to consider and express their views upon the question. In Fletcher *vs.* Peck, 6 Cranch, p. 87, Chief Justice Marshall said : " The question whether a law be void for its repugnancy to the Constitution is at all times a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative in a doubtful case. The Court, when impelled by duty to render such a judgment would be unworthy of its station could it be unmindful of the solemn obligations which that station imposes."

But it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the constitution and law should be such that the judge feels a clear and strong conclusion of their incompatibility with each other.

Are, then, the acts of Congress, which authorized the issue of Treasury notes and made them a legal tender in payment of debts clearly unconstitutional?

The power to coin money and regulate the value thereof, is expressly granted to Congress in the Constitution.

The Constitution also declares that no State shall coin money, emit bills of credit, or make any thing but gold and silver coin a tender in payment of debts.

This sovereign attribute, therefore, of coining money and regulating its value belongs to Congress exclusively.

I cannot resist the conviction, however, that under the grant of power to coin money, it was not the intention of the framers of the Constitution to provide for the emission of paper money or bills of credit. Treasury notes are undoubtedly bills of credit. Prior to the Revolution bills of credit on emergency had been issued by several, if not all of the States, and some were made legal tender by law in payment of debts. In other instances they were not made a legal tender, but were left to find their level in the

market, on the credit of the Government's issuing them. During the Revolution they were issued in large amounts both by the States and by the Confederacy. The Articles of Confederation expressly granted to Congress the power to issue bills of credit, and without this power, it was declared by Mr. Mason, an influential member of the convention which framed the present Constitution, the war of the Revolution could not have been brought to a successful result.

The power, however, of coining money, and that of issuing bills of credit were treated as separate and distinct powers, both in the Articles of Confederation and in the present Constitution.    By the Constitution the States are prohibited from coining money and also from emitting bills of credit.    The prohibition to coin money, if it stood alone, would have still left to the States the power to emit bills of credit.

To emit bills of credit is, therefore, something different from coining money.    Hence, the power granted to Congress to coin money does not confer the power to emit bills of credit.    That power, if it exist at all, must be found in some other part of the Constitution, or must be an implied power as a necessary and proper means of carrying into effect other powers expressly granted.

The history of the colonies in their wars with the French, and with the Indians, prior to the Revolution proved how necessary it was that this power should be given to the new Government, which was to succeed them in the exclusive right to make war and peace, and suppress domestic insurrection.    The Revolution itself, though it flooded the country with bills of credit, which at last became utterly worthless, was sustained throughout mainly from this resource, without which its armies must have been disbanded, and its cause given up in despair.

Every nation which had attained power and greatness in the world had been forced, at some time or another to

resort to the use of paper money in its struggles to maintain existence against the attacks of foreign enemies or domestic war.

These considerations cannot be supposed to have escaped the attention of the eminent men who framed the Constitution.

As already stated, the power to emit bills of credit was expressly granted in the Articles of Confederation. We do not find that it was renewed in the present Constitution in express terms.

At the time when the convention assembled the condition of the country was far from prosperous, and the people were still suffering from the prostration consequent upon the long and exhausting war which resulted in the establishment of their independence. They felt the evils of the continental currency, forgetting the obligations which they owed it for carrying them to final victory and nationality.

Such was the state of feeling when the subject was presented for deliberation in the convention. Mr. Mason and Mr. Madison, both of them sagacious and wise patriots, were in favor of again conferring the power by express terms. Others probably agreed with them, of whose opinions we have no record. Some thought that it was unnecessary to make the express grant, as the power might be implied as a means necessary to carry into effect other express powers. Others, still, denounced the power, and were wholly opposed to it in either shape. A large majority of the convention refused, by vote, to insert the power in the Constitution by express grant. The power, however, was not prohibited to Congress, and it is highly probable that the convention left the subject, designedly, in this condition, that after-times might decide for themselves according to the exigencies of the republic, whether it was indeed a power necessary to save it from threatening destruction; and if so, that it might then be called into exercise.

By express grant Congress is clothed with power to de-

*15*

clare war, to raise and support armies, and to provide for calling forth the militia to execute the laws of the Union, suppress insurrections, and repel invasions. It is clothed also by express grant with power to make all laws which shall be necessary and proper for carrying into execution the foregoing powers.

It must be manifest to every mind that without the power to issue treasury notes, and to make them also a legal tender in payment of debts the Government of the United States must have been destroyed before the end of even the second year of the present war.

A war of its vast dimensions could never be supported upon the proceeds of loans and taxes only. The gold and silver of all the world would scarcely suffice for so great an undertaking.

The war was forced upon the government. It could have been avoided only by the government consenting to its own dissolution.

The treasury notes in question were necessary as a means therefore, not merely to carry on the war, but to sustain the very existence of the nation.

Are they unconstitutional?

In the great case of McCullough *vs.* The State of Maryland, 14 Wheat., 316, we have the views of the Supreme Court of the United States applicable to this subject in a luminous and masterly exposition of the powers of Congress, by Chief Justice Marshall. These views are authoritive over this Court, and I will venture also to add, that had they been followed and obeyed in the administration of the government the present rebellion would not have been possible.

I shall quote a few passages from that opinion:

"The Government which has the right to do an act, and has imposed on it the duty of performing that act must, according to the dictates of reason, be allowed to select the means."

Again: "But the Constitution of the United States has not left the right of Congress to employ the necessary means for the execution of the powers conferred on the Government to general reasoning. To its enumeration of powers is added that of making all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the Government of the United States, or any department thereof."

Another paragraph: "We admit, as all must admit, that the powers of the Government are limited, and that its limits are not to be transcended. But we think the sound construction of the Constitution must allow to the national legislature that discretion with respect to the means by which the powers it confers are to be carried into execution which will enable that body to perform the high duties assigned to it in the manner most beneficial to the people. Let the end be legitimate; let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, and *which are not prohibited,* but consist with the letter and spirit of the Constitution, are constitutional."

The opinion closes with the declaration of the following test, by which the Courts are to judge of the constitutionality of an Act of Congress: "That where the law is not prohibited, and is really calculated to effect any of the objects entrusted to the Government, to undertake here to inquire into the degree of its necessity, would be to pass the line which circumscribes the judicial department, and to tread on legislative ground. · This Court disclaims all pretensions to such a power."

I think, therefore, that the plaintiffs in this action ought not to recover, and the decision of the Court below was right; first, because they have sued upon a special contract, and no special contract was proved; second, because the Court below was right in excluding evidence of usage at other banks than that of the defendants, and no evidence of

usage is admissible to vary the rights or liabilities of parties to a contract, when those rights or liabilities are clear under the law; and third, because the contract between the parties, whether express or implied, was evidence of a debt owing by the defendants to the plaintiffs; that the defendants had a right to pay such debt in lawful tender notes of the Treasury, and that payment of the defendant was tendered in those notes and refused by the plaintiffs, and the notes subsequently tendered in Court at the trial of the cause, and acceptance again refused by the plaintiffs.

I am not quite satisfied to close this opinion without alluding to certain aspersions which have been attempted to be cast during the hearing of the case, upon the honor of the defendants in regard to this transaction.

Ours is to be sure, not a court of honor, but a court of law and equity, and when on these grounds we decide in favor of a party, there our jurisdiction terminates and there, also, in my judgment, our opinion ought to stop.

I must, however, be permitted to say that I have seen nothing whatever in the conduct of these defendants in regard to the matters in controversy, which can even excuse the imputations referred to. They are, in my judgment, wholly ungrounded.

MR. JUSTICE OLIN concurred in the conclusions expressed in the foregoing opinion.

MR. CHIEF JUSTICE CARTTER delivered the following dissenting opinion:

The action pending is an action of special *assumpsit*, by which the plaintiffs seek to recover the value of what they allege to be a special contract for the deposit of coin. The facts show that in the summer of 1861, Riggs & Co. were bankers in the city of Washington; that the plaintiffs were business men, doing business as plumbers, and having their bank account with the defendants, and that covering the period of the relations of the parties in the summer of

1861 the bank currency used in the business of the District of Columbia began to lose its credit and public confidence and fell below par, making coin as a circulating medium represent one value and bank currency another. To accommodate the relations of the bank to the business of the District of Columbia, the defendants in common with the other banks and bankers of the District adjusted their books and bank relations accordingly, keeping a coin account to be responded to in coin and a paper currency account to be responded to in paper.

Under these circumstances, we find the plaintiffs as depositors with the defendants in the sum of six thousand dollars, twenty-five hundred dollars of which was in paper currency and the balance in coin, when the defendants notified the plaintiffs that if they would hold the bank responsible in coin for the whole amount of their deposit, they must convert the paper currency proportion of it into coin, whereupon the plaintiffs complied with the request of the defendants and transferred their entire deposit into coin. The parties sustained this relation to each other until the 25th of February, 1862, when the transaction was overtaken by the act of Congress, making Treasury notes a legal tender in payment of all debts. The contract then as settled by the parties was a deposit of six thousand dollars in coin with the defendants as bankers, to be repaid in coin, according to its express stipulations. The defendants have received the plaintiffs' coin. Have the plaintiffs a right to its return or its value? Good faith and conscience answer, "Yes." The question is, "Does the law give any other answer?"

Before considering the effect of the legal tender law of February 25th, a word or two in reference to the objection to the constitutionality of said law. The constitutional objection is made to it, but not argued. I concur with my associates that the law is constitutional. Not, however, because the Constitution expressly gives the power to Con-

gress to make a paper currency lawful tender or a circulating medium. The Constitution does no such thing expressly. On the contrary, it expressly prohibits the exercise of that power on the part of the States and does not expressly confer it upon the Government of the United States. If the power exists at all, it is a power implied in the self preservation of · the nation and underlying the express powers granted to the Government for that purpose.

If this act of legislation was vital to the preservation of the Government which I believe, it has its authority in the vitality of the Government. The right of self-preservation is a fundamental law of personal existence—why not of national? The imperious and unavoidable necessities of the Government, I regard as a part of the fundamental and constitutional law of its existence. This principle has been acknowledged practically by all nations in the past, and in the past history of this nation, and while it has not been distinctly incorporated into the letter of the fundamental law, or expressly and definitely rendered by judicial authority, it has always been so constructively. I prefer its direct avowal to constructive recognition, and therefore join in the conclusion of my associates in its constitutionality.

Here we divide: I think that the Court below erred in rejecting proof of the uniform custom of all the banks of the District of Columbia, going to show that special relation of depositors to the bankers in the District was to receive back their deposits in kind; coin in return for coin deposited, and bank paper in return for bank paper deposited. The uniform custom of the banks of the District constitute a part of the law of the contract of the District, and the plaintiffs had a right by their dealings with these defendants (they having been proved to be bankers in the District), to show what that custom was, and when shown, such proof would of itself, and unaided by the express stipulations of the parties, have created between them the rela-

tions which the custom established. The express stipulations of the parties concurring with this established custom, the parties had a right to the benefit of that custom in further enlightening their relations.

In the rejection of this testimony, I think the Court below erred. I pass now from the question of proof to the main question in the case, which will be found involved in the following instructions of the Court, to wit:

"If the jury find from the evidence that the defendants were bankers in the years 1861 and 1862, and that the coin mentioned in the declaration was deposited with said defendants, as bankers, to be repaid in coin, said deposit created a debt from the defendants to the plaintiffs, which could be discharged by a payment or offer to pay the same in legal tender notes, and if the jury further find that said tender was made, the plaintiffs were not entitled to recover in their action."

These instructions bring me to the consideration of the office and effect of the act of Congress of February 25, 1862, upon the rights of the parties under this contract. That statute provides that "treasury notes shall be receivable in payment of all taxes, internal duties, excise duties, and demands of every kind due to the United States except duties on imports and of all claims and demands against the United States of every kind, except for interest upon bonds and notes which shall be paid in coin, and shall be lawful money and a legal tender in payment of all debts, public and private, within the United States except duties on imports and interest as aforesaid."

The clause "legal tender upon all debts, public and private" is selected as the text by the authority of which the contract under consideration is not to be satisfied in kind but legal tender currency, dollar for dollar, to the amount of the deposit. The first objection to this conclusion is that the parties intended no such thing, and that the parties had the right to determine the point if the subject of

the contract and the competency of the party permitted them to make it. The contract which they intended to make, and which they did make, was widely different in value from the one sought to be enforced by such construction of the law. The *language* of the law is "all debts public and private." The *meaning* of the law is "all liquidated indebtedness, public and private." It could never have been designed to break up the expressly stipulated value of a contract. To give it such construction would be to assume the right in the legislature to impair and invalidate the contract which is prohibited by the Constitution. This law does not affect to pronounce what the value of a contract shall be, but when such value is ascertained how it shall be satisfied. The term "indebtedness" in the sense of the statute has no significance until the amount of indebtedness is arrived at by the value fixed to the contract by the parties.

In the act of the 25th of Febuary, 1862, Congress created a special currency, special in its relations to the obligations of and indebtedness to the Federal Government, giving it the office of satisfying debts and taxes, and prohibiting it in the satisfaction of duties and interest. upon one class of its bonds, reserving to itself the right to be paid in coin as a distinguished currency, and taking upon itself the obligations to pay in coin as a distinguished currency. Can it be claimed by any fair use of logic that the Government retained to itself the right to make this distinction for itself and withhold it from the citizen? The very provision that required the duties to the Government to be paid in gold, compelled the citizen to acquire the gold to make the payment, and if the right to receive it is established under the law, the right to purchase gold for the purpose of paying it upon duties is established under the law. The practical effect of taking away the right of the party to contract for the purchase and sale of gold would be to defeat the purpose of the Government to collect their revenues in gold.

The moment that the citizen ascertains that his contracts in relation to gold were void, gold instead of making its appearance in the banks and market places of the nation would find its way into the dark holes of the earth, available to nobody.

That Congress recognized a distinction in value between the coin and paper currencies of the country, and the rights of parties to contract with reference to that distinction, is manifest not only in the act making treasury notes a legal tender, but in all the contemporary legislation upon the subject.

On the 3d of March, 1862, six days after the passage, the same Congress enacted that on all contracts for the purchase or loan of coin, or upon security of any certificate, or other evidence of deposit, payable in gold or silver coin, there should be a Government stamp fixed; otherwise, void. (Vol. 12, United States Statutes, pp. 719, 729).

Afterwards, on the 17th of March, 1862, twenty days subsequent, they authorized the Secretary of the Treasury to purchase coin " at such rates and on such terms as he may deem most advantageous." U. S. Statutes, Vol. XII, p. 370, sec. 1.

These acts recognize the distinction of value in the two species of currency, and authorized the Secretary of the Treasury to enter the market for purchase, with discretionary power as to premium. If the Secretary of the Treasury had the right to make contracts, discriminating between the value of the two species of currency, the citizen inherited the same right under the operation of the law.

This view of the subject leaves the real value of the contract and the right of the parties to make it unimpaired.

The argument and authorities so ingeniously and ably presented by the counsel of the defendant in conflict with this view do not appear to me to be addressed to the case at issue. They contemplate a general indebtedness under the implications of the law, and in that connection only,

*16*

they are good authority and good argument.    The proposition that a general depositor of money in a bank by the act of his deposit, and by the construction of the law, loans his money to the banker is true, and if nothing supervened to change the relations of the parties, the law would satisfy the indebtedness in legal tender notes in the nominal amount of the deposit.    But this is not the case at issue. The parties supervened with a special contract which they have a lawful right to make, and with the interposition of such contract they changed the current of their rights under the law from an implied to an expressed condition. The contract in this case makes the deposit of the plaintiffs with the defendants the equivalent of a special deposit. The right which the law implies in a special deposit to receive back that which the party has deposited, or its value in the event of refusal if secured by the express terms of this contract, and to judge otherwise is to impeach the power of the parties to make a contract, which is not attempted, and if it had been could not have been successful.

Thus I have briefly expressed my opinion which has brought me to the satisfactory conclusion that the instructions of the Court were erroneous, and that the judgment of the Court below should be reversed; and the plaintiffs ought to be permitted to recover the value of their contract.