**David HORNSTEIN, et al., Appellants,**

**v.**

**Marion BARRY, et al., Appellees.**

**No. 83–242.**

District of Columbia Court of Appeals.

Argued April 24, 1984.

Decided Sept. 11, 1987.

Burton Schwalb, with whom Laura A. Kumin and Patricia L. Maher were on the brief, for appellants. Jerome Nelson, Washington, D.C., also entered an appearance for appellants.

Lutz Alexander Prager, Asst. Corp. Counsel, with whom Inez Smith Reid, Corp. Counsel, John H. Suda, Principal Deputy Corp. Counsel, respectively, at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellees.

Before FERREN and TERRY, Associate Judges, and REILLY, Senior Judge.

PER CURIAM:

This appeal by the title holders of a residential apartment building from an entry of summary judgment and dismissal of the complaint in an action against the District of Columbia government (and certain named officials) raises several issues including a challenge to the constitutionality of the Rental Housing Conversion and Sale Act of 1980, D.C.Code § 45–1601 *et seq.* (1981). We affirm in part, reverse in part, and remand for trial one issue on which we deem disposition by summary judgment not appropriate.

In this complaint, appellants—sole trustees of a trust which includes the ownership of the Savoy, a 203 unit apartment structure at 1101 New Hampshire Avenue, N.W. —alleged that the Department of Housing and Community Development (the Department), the agency which administers the municipal laws relating to condominium conversion, wrongfully refused to accept and process an application to change the Savoy rental units into condominia. The complaint also assailed as unconstitutional a provision of the Act which makes a consent by the majority of current tenants a condition precedent to conversion and asserted that the operation of the conversion statute in conjunction with District rent control laws disregarded a provision of the Fifth Amendment which forbids "private property [to] be taken for public use, without just compensation." The following facts appear to be undisputed in the record.

On December 29, 1978, the Department issued a certificate of eligibility to appellants to convert the Savoy into condominia based on an application and showing that it qualified as a "high rent" housing accommodation under the later repealed Section 501 of the Condominium Act of 1976, D.C. Code § 5–1281(b)(1)(A) (Supp. V 1978).[1]

---

1. This section of the 1976 Act provided:
   A housing accommodation or rental unit in the District of Columbia may be converted into a condominium,

   (A) if that housing accommodation is a high rent housing accommodation or if that rental unit is located in a high rent housing

Section 406 of this Act, still in force and incorporated into existing law as D.C.Code §§ 45–1863, –1866 (1981), provides that once an owner obtains such a certificate, he must then file an additional instrument, *viz.*, an application for registration, before he is authorized to sell a rental unit as a condominium. Within five days after receiving such an application for registration, the District issues a "notice of filing" to the applicant acknowledging receipt of the application. Thereafter, the District reviews the application and within a sixty day period accepts or rejects it. If no action is taken within this period, the condominium is deemed "registered" unless the applicant has consented in writing to the delay.

On May 29, 1979, the District Council passed the first of a series of emergency acts declaring a 90–day moratorium on "high rent" conversions.[2] These acts were adopted by the Council for the stated purpose of preventing further depletion of the rental housing supply of rental accommodations in the District—a condition of affairs which the Council found to be aggravated by the growing number of conversions of rental properties to condominia and cooperatives. D.C.Code § 45–1601(3) (1981). This Act limited the Mayor's authority to honor certificates of eligibility based on the high rent exemption should the holder file the additional instruments required for conversion.

When the 90 days—the maximum period for which emergency legislation could be effective under the Home Rule Act[3]—expired, the Council again invoking its "emergency" powers, passed successive, substantially identical 90 day acts.

The validity of these acts was attacked by another party in an action for declaratory judgment and injunctive relief on the ground that the Council was in effect enacting legislation of a permanent nature under the guise of an emergency, thereby unlawfully avoiding statutory Congressional review. The trial court agreed with this contention and granted an injunction which was stayed pending appellate review.[4] We affirmed the trial court, *District of Columbia v. Washington Home Ownership Council, Inc.*, 415 A.2d 1349 (D.C.1980) (en banc), but stayed our mandate for 90 days.

This opinion was released on May 20, 1980. More than two months later—on July 25 of that year—appellants, assuming that there was no longer any valid legislation barring the second procedural step to the conversion of high rent apartments, acted upon their certificate of eligibility and filed an application with the Department to register the Savoy as a condominium.

They apparently had overlooked the impact of intervening Council action. Conversions were controlled at that time by D.C.Law 3–53, entitled the Condominium and Cooperative Stabilization Act of 1979, 27 D.C.Reg. 34 (1980), enacted by the Council while the appeal was pending. This Act was submitted to Congress for review. After the expiration of the statutory review period, and in the absence of a disapproval resolution, it became effective on February 23, 1980, and was in force for 180 days thereafter. This Act provided that "the Mayor shall not issue any notice of filing of an application for registration of a condominium pursuant to [the procedure set forth in] § 406 of the Condominium Act of 1976 if that housing accommodation was declared eligible to convert pursuant to § 501(b)(1)(A) [the high rent section] of the Act." 27 D.C.Reg. 37–38 (1980). Under D.C.Law 3–53, notice of filings could be issued only to owners who had applied for registration (as opposed to obtaining a certificate of eligibility) *before* May 1979, purchased units in contemplation of conver-

---

accommodation at anytime after March 27, 1977.

**2.** These measures included the Emergency Condominium and Cooperative Stabilization Act of 1979, D.C.Act 3–44, 25 D.C.Reg. 10363 (June 1, 1979); D.C.Act 3–95, 27 D.C.Reg. 1014 (August 31, 1979); D.C.Act 3–132, 26 D.C.Reg. 2436 (No-

vember 30, 1979); and D.C.Act 3–151, 27 D.C. Reg. 844 (February 29, 1980).

**3.** D.C.Code § 1–146(a) (1979 Supp.).

**4.** *Washington Home Ownership Council, Inc. v. District of Columbia,* Civil Action No. 10624–79 (Super.Ct. Oct. 19, 1979).

sion, served tenants with notice of intent to convert, made "substantial financial investment" toward conversion or had obtained tenants' consent to the conversion.

Even though appellants' application failed to qualify under these new requirements, the Department, also in apparent ignorance of Law 3-53, issued a notice of filing to appellants on July 28, 1980. Three weeks later, on August 19, 1980, the Department realized its error. It notified appellants' counsel of its mistake, and informed him that appellants' application for registration would have to be returned as incomplete because it did not include a certificate of eligibility to convert to condominia based on tenant consent. In an effort to resolve the problem, the parties agreed that the Department would retain the Savoy's application until the Superior Court issued an order pursuant to a remand of the *Home Ownership Council, supra* note 4, decision.

In August and September of 1980, the District enacted still stricter legislation regarding condominium conversion. *See* Rental Housing Conversion and Sale Act of 1980, D.C.Law 3-86, D.C.Code § 45-1601 *et seq.* (1981) (hereinafter September 1980 Act). This new legislation recognized only two kinds of conversions: those which had been approved by a majority of the qualified tenant voters [5] and those for which a notice of filing was issued prior to September 10, 1980, the effective date of the Act. D.C.Law 3-86, § 210, 27 D.C.Reg. 2975, 2985-86.

On December 3, 1980, the Superior Court issued an opinion and order holding that its prior judgment declaring the interim emergency acts invalid, should be given a "purely prospective application" and that all statutes passed prior to August 28, 1980 were of full force and effect until that date. *See Washington Home Owners Council, Inc. v. District of Columbia,* Civil Action No. 10624-79 (December 3, 1980). No appeal was taken. On December 23, the District

returned appellants' registration application unprocessed.

In May 1981, appellants filed a three count complaint in the Superior Court. In the first count, appellants challenged the rejection of its application for conversion, asserting they qualified under the § 210 grandfather clause of the September 1980 Act because they possessed a previously issued notice of filing and hence the tenant election provision was inapplicable. The second count alleged that they were entitled to relief because the invalid emergency acts precluded them from completing what would have been a lawful conversion. Finally, appellants complained that the tenant consent provision of the September 1980 Act unconstitutionally delegated governmental authority to the tenants, and that the Act alone, or in combination with the District's rent control laws, operated to take unlawfully private property without just compensation in violation of the Fifth Amendment. The complaint sought declaratory and injunctive relief, as well as monetary damages.

The District filed a motion to dismiss the complaint, or in the alternative, to grant summary judgment as to each count. Appellants similarly filed a cross motion for summary judgment. The trial court by order of January 28, 1983, granted the District's motion and dismissed appellants' complaint with prejudice. This appeal followed.

**I**

Appellants' position is that the trial court erred as a matter of law in granting the District's motion for summary judgment. Summary judgment is an appropriate remedy when there are no material facts in issue and when it is clear that the moving party is entitled to judgment as matter of law. *Swann v. Waldman,* 465 A.2d 844, 846 (D.C.1983); *Burch v. Amsterdam Corp.,* 366 A.2d 1079, 1083-84 (D.C.1976); Super.Ct.Civ.R. 56(c). The burden of demonstrating the absence of a genuine issue

---

5. A qualified voter is a tenant who resides in the rental unit as a principal place of residence, is a domiciliary of the District, and pays at least one-half of the cost of maintaining the rental unit. D.C.Code §§ 45-1603(9), -1612(i) (1981).

of material fact is upon the movant. *Himmelfarb v. Greenspoon*, 411 A.2d 979, 983 (D.C.1980).

Appellants advance a number of reasons to support its argument that the Department wrongfully refused to process the application for registration. The most cogent is that the Department should have honored the notice of filing it issued on July 28, 1980, because Section 210 of the September 1980 Act, as we have pointed out, did not prevent conversions based upon issuance of such notices before September 10, the date the new Act became effective.[6]

This argument would carry great weight with us on the premise that the September 1980 Act had implicitly limited the impact of D.C.Law 3–53 on pending applications for conversion were it not for the fact that the notice of filing upon which appellants rely had been revoked prior to September 10.

■ When appellants received notice of filing, the Department was prohibited from issuing notices to "high rent" housing accommodations under then controlling D.C.Law 3–53. Thus, despite the Savoy's certificate of eligibility based on its high rent status, the Department was without authority to issue such a notice. Hence, its prompt revocation of this document was merely a notification to the applicants that its inadvertent action was not valid under D.C.Law 3–53. In the context of the then existing statutes, we cannot hold such revocation improper. As the facts are not in dispute, the court's rejection of this argument on summary judgment will not be disturbed.

■ Appellants also contend that their motion for summary judgment should have been sustained because the successive moratoria on the conversion of high rent apartments which the Council enacted after they

had received certificates of eligibility were illegal, as this court eventually held in the *Washington Home Ownership Council* case, *supra*. Granted that the passage of such legislation may have discouraged appellants from filing the second instrument required for approval of condominium conversion, we cannot hold that in the posture of this case appellants were aggrieved by these impermissible actions of the municipal legislative body. No application to further the conversion of the Savoy units into condominia was made while this "emergency" legislation was in effect. Nor were appellants parties to the litigation which culminated in our en banc holding declaring such legislation in excess of the statutory power of the Council. By the time appellants did file the requisite application for registration, the improper legislation was no longer on the books, having been replaced by D.C.Law 3–53. This Act was unaffected by the decisions relating to the preceding emergency acts, for it was not made effective until the period for congressional review had elapsed. As the Department acted under the authority of this law, not the invalidated legislation, in refusing to process the Savoy application, it appears that the action of the District officials was not violative of the controlling statute.

## II

■ Appellants challenge the constitutionality of the statute under which the Department denied its condominium application. More specifically, the complaint asserts that requiring the consent of a majority of rental tenants to a conversion unconstitutionally delegates to private citizens the legislative power granted by Congress to the Council. The Rental Housing Conversion and Sale Act conditions any proposed condominium conversion upon the approval of a majority vote of eligible tenants in a tenant election.[7] D.C.Code §§ 45–

---

**6.** Section 210 provided in pertinent part:

> This title applies to conversion of housing accommodations into condominium or cooperative status for which no notice of filing is issued pursuant to Section 406 of the Condominium Act [of 1976] (D.C.Code § 5–1266

(Supp. V 1978)) ... prior to the effective date of this title.

The successor to this section, substantially identical in effect, is at D.C.Code § 45–1618 (1981).

**7.** D.C.Code § 45–1612(d) (1986 Replacement) defines qualified tenant voters:

1611, –1612 (1986 Replacement). Section 45–1611(a)(1) prohibits any conversion until the Mayor has certified compliance with the provisions of the Act. And § 45–1612(j) provides that "if 50 percent or less of the qualified voters vote in approval of conversion, or if an election is invalidated by the Mayor because of fraud or coercion in favor of conversion on the part of the owner, the Mayor shall not certify compliance with this section for purposes of conversion, and an owner may not request another tenant election for that accommodation for 1 year from the date of election." Thus, it is apparent that, under the statute, a majority of eligible tenant voters can veto any proposed condominium conversion. Appellants' failure to conduct such an election does not foreclose consideration of their challenge to the tenant consent provision of the statute. Appellants do not challenge a specific application of the tenant consent provisions but rather contend that it is facially unconstitutional. As such, they may raise this claim without being required to conduct such an election. *See Town of Gardiner v. Stanley Orchards, Inc.*, 105 Misc.2d 460, 462–64, 432 N.Y.S.2d 335, 338 (1980). Moreover, appellees do not argue otherwise.

The United States Court of Appeals for the District of Columbia Circuit has noted—without deciding the issue—that such a claim does raise a substantial federal question. *See Silverman v. Barry*, 234 U.S.App.D.C. 22, 27, 727 F.2d 1121, 1126 (1984). Unfortunately, it is not clear whether certain Supreme Court decisions in which such legislative delegation has been invalidated have significant bearing upon similar restrictions concerning condominium conversions. *See* Note, *The Validity of Ordinances Limiting Condominium Conversions*, 78 MICH.L.REV. 124, 135–41 (1979); *Development in the Law—Zoning*, 91 HARV.L.REV. 1427, 1532–42 (1978). An analysis of the leading cases discussing the propriety of legislation contingent upon the approval of private individuals reveals a fine and often confusing dividing line between constitutional and unconstitutional delegation.

In *Eubank v. City of Richmond*, 226 U.S. 137, 33 S.Ct. 76, 57 L.Ed. 156 (1912), the Supreme Court held unconstitutional an ordinance which directed the city committee on streets to establish a building line (prohibiting the construction of buildings within the limits of such line) whenever two-thirds of the abutting landowners requested it. The Court found that the statute left no discretion to the committee in such a case and conferred "the power on some property owners to virtually control and dispose of the property rights of others [while the statute] creates no standard by which the power thus given is to be exercised; in other words, the property holders who desire and have the authority to establish the line may do so solely for their own interest or even capriciously." *Id.* at 143–44, 33 S.Ct. at 77.

In rejecting appellants' reliance upon *Eubank*, the trial court in its memorandum opinion in this case cited *Cusack Co. v. City of Chicago*, 242 U.S. 526, 37 S.Ct. 190, 61 L.Ed. 472 (1917), upholding an ordinance, based on a legislative finding that billboards in residential areas were a nuisance, prohibiting the erection of any billboard in such an area unless a majority of abutting property owners consented. The Supreme Court held that to permit a waiver of an otherwise applicable prohibition by persons for whose protection the law was enacted "is not a delegation of legislative power, but is ... a familiar provision affecting the enforcement of laws and ordinances." *Cusack, supra*, 242 U.S. at 531, 37 S.Ct. at 192. The Court distinguished *Eubank, supra*, on the ground that, in

*Qualified voter.*—A head of household residing in each rental unit of the housing accommodation is qualified to vote unless no member of the household has resided in the accommodation for at least 90 days before the election, or unless a member of the household is or has been an employee of the owner within 120 days prior to the date of application for eligibility, or unless he or she is a head of household whose continued right to remain a tenant is required by this chapter. The Mayor shall determine the eligibility of voters prior to the election and shall devise such forms and procedures as may be necessary to verify eligibility under this subsection.

contrast to a prohibition that could be waived by a majority of those most directly affected by it, the challenged building line ordinance "left the establishment of the building line untouched until the lot owners should act and then made the street committee the mere automatic register of that action and gave to it the effect of law." *Cusack, supra,* 242 U.S. at 531, 37 S.Ct. at 192.

The force of this distinction between an ordinance that allows a small group of citizens to impose a restriction upon a property owner, and one which allows the same group to waive a prohibition designed for its protection, was severely weakened in *Washington ex rel. Seattle Title Trust Co. v. Roberge,* 278 U.S. 116, 49 S.Ct. 50, 73 L.Ed. 210 (1928). In *Roberge,* the Court struck down a Seattle ordinance conditioning construction of a philanthropic home for elderly indigents on the consent of two-thirds of property owners within four hundred feet of the proposed structure. "A comprehensive zoning ordinance ... divided the city into six use districts and provided that ... no building should be erected for any other purpose other than that permitted in the district in which the site is located." *Id.* at 117, 49 S.Ct. at 50. The permitted uses did not include a philanthropic home. An amendment to the comprehensive zoning ordinance, however, provided that "[a] philanthropic home for children or for old people shall be permitted in First Residence District when the written consent shall have been obtained of the owners of two-thirds of the property within four hundred (400) feet of the proposed building." *Id.* at 118, 49 S.Ct. at 50–51. Relying on *Eubank, supra,* the Court struck down the ordinance as an "arbitrary" delegation of power "repugnant to the due process clause of the Fourteenth Amendment." *Id.* at 122–23, 49 S.Ct. at 52. The Court distinguished *Cusack, supra,* by noting that it involved a legislative finding that billboards constituted a nuisance and were likely to endanger the safety and decency of the areas from which they were prohibited. In sharp contrast, in *Roberge, supra,* no similar finding existed to show that the construction of a philanthropic home would be a nuisance.

The three foregoing holdings are not easy to reconcile. We recognize that "some courts have upheld consent requirements by regarding the consent of the landowner as a waiver of an existing restriction, rather than the imposition of a restriction." 3 ANDERSON, AMERICAN LAW OF ZONING § 21.15, at 700 (3d ed. 1986). *See, e.g., Arno v. Alcoholic Beverages Commission,* 377 Mass. 83, 88–89, 384 N.E.2d 1223, 1227 (1979); *State Theatre Co. v. Smith,* 276 N.W.2d 259, 263 (S.D. 1979); *Marta v. Sullivan,* 248 A.2d 608 (Del.1968); *Robwood Advertising Associates, Inc. v. City of Nashua,* 102 N.H. 215, 217–18, 153 A.2d 787, 789 (1959); *Cross v. Bilett,* 122 Colo. 278, 221 P.2d 923 (1950); *DuPont v. Liquor Control Commission,* 136 Conn. 286, 71 A.2d 84 (1949). Assuming that the limitations on condominium conversions can accurately be characterized as a prohibition, with a waiver provision, we conclude in any event that this distinction is not controlling. We agree with the Illinois Supreme Court that "the subtle distinction between 'creating' and 'waiving' a restriction cannot be justified." *Drovers Trust & Savings Bank v. City of Chicago,* 18 Ill.2d 476, 478, 165 N.E.2d 314, 315 (1960). *See also* Note, *The Validity of Ordinances Limiting Condominium Conversions,* 78 MICH.L.REV. 124, 137–38 (1979). The same concerns of arbitrariness, capriciousness and lack of standards remain identical in both situations. *See id.* at 137 ("Laws that accommodate that formalistic standard may still permit neighbors to prohibit unwanted uses capriciously.").

In any event, in 1976 the Supreme Court again considered the delegation issue in *City of Eastlake v. Forest City Enterprises,* 426 U.S. 668, 96 S.Ct. 2358, 49 L.Ed.2d 132 (1976). Although presented with an opportunity to overrule *Eubank, supra,* and *Roberge, supra,* the Court instead distinguished them. At issue in *Eastlake* was a municipal ordinance which not only required approval by the city council of any application by a landowner for a deviation from the use prescribed by a city wide

zoning plan, but also conditioned the effectiveness of such approval upon a 55% voter ratification in a popular referendum. In sustaining the constitutionality of the latter condition, the Court declared a referendum in which all registered voters in the municipality could participate merely as a proper deference of the legislative body to the reserved power of the people from whom all governmental authority is derived. It concluded that a referendum "cannot ... be characterized as a delegation of power." *Eastlake, supra*, 426 U.S. at 672, 96 S.Ct. at 2361. The majority opinion (from which three Justices dissented), in refusing to follow *Eubank* and *Roberge*, characterized those decisions as dealing with delegation to a *"narrow segment* of the community, not the people at large," *Eastlake, supra*, 426 U.S. at 677, 96 S.Ct. at 2364 (emphasis in original), and went on to say:

> Neither *Eubank* nor *Roberge* involved a referendum procedure such as we have in this case; the standardless delegation of power to a limited group of property owners condemned by the Court ... is not to be equated with decisionmaking by the people through the referendum process.

*Id.* at 678, 96 S.Ct. at 2364.

In light of these observations, appellants' argument that the challenged statute allows a cluster of tenants who have a financial interest in preventing their rental units from conversion actually to prohibit such conversion has considerable force. Certainly, it cannot be denied that a group of tenants in a given building—and not all tenants at that—falls into category of a "narrow segment of the community." *Id.* at 677, 96 S.Ct. at 2364. Furthermore, while it is true that the *Eastlake* opinion did not overrule *Cusack*, whatever vitality it retains must still be viewed in light of *Roberge*. As in *Roberge*, there has been no finding here that the conversion of an already existing building from rental units to condominium units would constitute a nuisance. Conversion from rental units to condominia is simply not analogous to the construction of billboards. The findings in D.C.Code § 45–1601 (1986 Replacement) detailing the shortage of rental units in the

District of Columbia, especially for those with low incomes, and the effects of condominium conversions on those shortages do not amount to a determination that such conversions would constitute a nuisance in the traditional sense in which that term has been used. We decline to read that much into the Council's legislative findings. In short, we do not believe that the Council's understandable concerns about the shortage of rental units are the same as those expressed in *Cusack* and the absence of which was deemed fatal in *Roberge*.

Contrary to appellees' argument, the Supreme Court's decision in *New Motor Vehicle Board of California v. Orrin W. Fox Co.*, 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978), does not support the validity of the tenant consent provision of the Condominium Conversion Act. In *Fox*, the Court faced a constitutional challenge to the California Automobile Franchise Act. The Act permitted a state regulatory agency (New Motor Vehicle Board) to delay an automobile manufacturer from granting a franchise if a competing franchisee filed a protest. Upon the filing of such a protest, the New Motor Vehicle Board notified the applicant that such a protest had been filed and that the proposed dealership could not be established until the Board had held hearings and made a determination that the proposed dealership was not contrary to the public interest. In rejecting the challenge to this statutory scheme, the Court, citing *Cusack*, stated that "An otherwise valid regulation is not rendered invalid simply because those whom the regulation is designed to safeguard may elect to forgo its protection." *Fox, supra*, 439 U.S. at 109, 99 S.Ct. at 411. This comment, however, must be read in context. There can be no dispute that one individual may decide to waive any right he or she may have. For example, as the Court noted, "Court approval of an eviction ... becomes necessary only when the tenant protests his eviction, and he alone decides whether he will protest." *Id.*

■ Additionally, in *Fox*, in contrast to the situation before us, a protest would only have the effect of triggering a hearing

before the New Motor Vehicle Board. The ultimate decision on whether to allow a new franchise to be established was left to the Board acting in the public interest. Competitors were not in the position of being able to veto new franchises. Under the statute at issue here, however, the tenants possess an absolute, unreviewable veto power over any condominium conversion. Consequently, the statute "provides no standard whatsoever by which the consents may be judged." *Shannon v. City of Forsyth,* 205 Mont. 111, 666 P.2d 750, 753 (1983).[8] As the statutory provision challenged here is deficient in the same respect, it cannot be sustained.

Having reached this conclusion, we wish to emphasize the narrow limits of our decision. We do not mean to suggest that the legitimate concerns of tenants lack relevance in determining whether a particular conversion should be permitted. For example, an act of the Council conditioning agency approval of a proposed condominium conversion upon prior notice to tenants and an opportunity for them to voice their concerns would not raise the constitutional issue we have discussed. *Cf. Fox, supra.* The final decision, however, must be made by a governmental agency according to some enunciated standards.[9] It cannot simply be left to the unreviewable whims of "a narrow segment of the community." *Eastlake, supra,* 426 U.S. at 677, 96 S.Ct. at 2364.

### III

It is one thing to hold that restrictions on land may be within the police or eminent domain powers of a legislative body, but quite another to say that such powers may be exercised without regard to the Fifth Amendment prohibition against the uncompensated taking of private property. In one count of their complaint, appellants alleged that combined effect of the local rent control and condominium statutes did indeed amount to such a taking. Although the trial court did not comment on this allegation in its memorandum opinion, its sweeping summary judgment order rejected this claim.

■■■ In our opinion, the trial court erred in disposing of this contention by summary judgment, for appellants' claim did raise issues of material fact. It is true that a showing that a legislative restriction on land use (*e.g.,* rent control, preservation of historic landmarks, etc.) will diminish the market value of a given piece of real estate is not sufficient to establish an illegal taking, if alternate uses survive which provide an aggrieved owner a reasonable financial return. *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *900 G Street Associates v. District of Columbia,* 430 A.2d 1387, 1391 (D.C. 1981). *See also First English Evangelical Church of Glendale v. County of Los Angeles,* —— U.S. ——, 107 S.Ct. 2378, 2388–89, 96 L.Ed.2d 250 (1987).

The trial court made no factual inquiry whether such alternative economic uses were available, however. Hence, it was premature to dismiss appellants' taking claim on the pleadings because resolution of this issue requires an "essentially *ad hoc* factual inquiry," *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 426, 102 S.Ct. 3164, 3171, 73 L.Ed.2d 868 (1983). The inquiry should include evidence "with respect to specific

---

8. *See also Drovers Trust and Savings Bank,* 18 Ill.2d at 478, 165 N.E.2d at 315; *Lakin v. City of Peoria,* 129 Ill.App.3d 651, 654–56, 84 Ill.Dec. 837, 840, 472 N.E.2d 1233, 1236 (1984).

9. Appellees contend that a decision invalidating the consent provision would lead to the ironical result that the prohibition on conversions would become absolute. *See* D.C.Code § 45–1663 (1986 Replacement) (Savings Clause). Appellants counter with the argument that "it is difficult to imagine ... that such an absolute provision ... could withstand a constitutional at-

tack." We express no views on either appellees' claim that invalidating the tenant consent will lead to an absolute prohibition on conversions or on appellants' counter-argument that such a prohibition would be unconstitutional. Rather, we leave it to the trial court on remand to determine what effect our invalidation of the tenant consent provision has on the remainder of the statute, taking into account the whole framework of the statute and any other arguments the parties may offer.

property, and the particular estimates of economic impact and ultimate valuation relevant in the unique circumstances." *Hodel v. Virginia Surface Mining and Reclamation Association,* 452 U.S. 264, 295, 101 S.Ct. 2352, 2370, 69 L.Ed.2d 1 (1981). *See also Silverman v. Barry,* 234 U.S.App. D.C. at 27, 727 F.2d at 1126.

Inasmuch as an issue of material fact remains which is not amenable to resolution as a matter of law, we must remand the case for a factual determination on appellants' assertion that the Conversion Act, alone or in conjunction with the rent control laws, deprives them of their property without just compensation.[10]

*Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.*

---

**10.** After this case had been briefed and argued, the Corporation Counsel, in continuing to argue for affirmance, drew our attention to an unpublished opinion of the United States District Court disposing of the remand in the *Silverman* case, *supra; Silverman v. Barry,* Civ. No. 81–0394 (D.D.C. August 22, 1986), *appeal filed,* No. 86–7037 (D.C.Cir. September 12, 1986). The trial court, after making extensive findings of fact, concluded that the financial loss incurred by the sellers of an apartment complex because of their inability to execute a prior contract of sale conditioned upon successful condominium conversion, did not entitle them to damages as "all economically viable use of the property was not obliterated," citing *Penn Central v. New York, supra,* 438 U.S. at 129–30, 98 S.Ct. at 2662. While we respect the court's analysis, we do not think this decision should bar appellants in this case from presenting evidence to sustain their claim of a deprivation of Fifth Amendment rights. If one accepts the reasoning of a recent decision of the Court of Appeals for the Ninth Circuit, *Hall v. City of Santa Barbara,* 813 F.2d 198 (9th Cir.1987), it may be that the enhanced tenure of tenants resulting from a rejection of a condominium conversion constitutes a transfer of a possessory interest in land—and thus a "taking."