## Robert I. SILVERMAN, et al., Appellants,

v.

## Marion BARRY, Mayor of the District of Columbia, et al.

### No. 86–7037.

United States Court of Appeals, District of Columbia Circuit.

July 15, 1988.

As Amended on Denial of Rehearing En Banc July 15, 1988.

Burton A. Schwalb and Lucinda J. Bach, Washington, D.C., were on the suggestion for rehearing en banc for appellants.

Before WALD, Chief Judge, ROBINSON, MIKVA, EDWARDS, RUTH B. GINSBURG, STARR, SILBERMAN, BUCKLEY, WILLIAMS, D.H. GINSBURG and SENTELLE, Circuit Judges.

## ORDER

PER CURIAM.

Appellants' suggestion for rehearing *en banc* has been circulated to the full court. No member of the court requested the taking of a vote thereon. Upon consideration of the foregoing, it is

ORDERED by the Court *en banc* that the suggestion is denied.

A statement of *Circuit Judge* SILBERMAN concurring in the denial of the suggestion is attached.

SILBERMAN, Circuit Judge, concurring in the denial of rehearing en banc:

Any time the state gives a group of persons power to prevent an action by another—if the group's majority or some other proportion wishes to do so—the state increases the bargaining power of that group vis-a-vis the proponent of action. I am inclined to agree with the D.C. Court of Appeals that the constitutionality of this kind of legislative "delegation" cannot, if one thinks hard about it, ultimately turn on whether the legislative scheme requires the group's initiative to remove a prohibition or to impose one. *Hornstein v. Barry,* 530 A.2d 1177, 1183 (D.C.App.1987), *reh'g en banc granted,* 537 A.2d 1131 (D.C.App. 1988). I suppose in the former situation there may be a slightly greater inference that the state has—as a matter of policy—determined that the action contemplated is generally disfavored; nevertheless, for the

---

**14.** It is important to note that multiple filings alone cannot be a predicate to a finding of frivolousness.

constitutionality of a given statute to turn on whether the group has the burden of going forward to stop proposed action or can simply exercise a veto when the proponent initiates action seems quite tenuous.

Nor do I think much turns on the panel's recognition that the District has a legitimate "police power" interest in adequate rental stock. *See Silverman v. Barry*, 845 F.2d 1072, 1087 (D.C.Cir.1988). I doubt there is any subject matter that falls outside of a state's police power. *See Nebbia v. New York*, 291 U.S. 502, 523–25, 54 S.Ct. 505, 509–11, 78 L.Ed. 940 (1934).[1] One could argue, moreover, that this condominium-conversion law—at least over time—will actually reduce rental apartments because it, like rent control laws, creates a powerful disincentive to the construction of new rental apartment buildings.[2]

Undeniably, however, the statute will enhance the bargaining power of existing tenants who live in affected buildings. As Judge Mikva noted, the Act was passed explicitly to affect "the bargaining position of tenants." 845 F.2d at 1087. One way of looking at the statute—and in my view the correct way—is to recognize the legislature deliberately sought to enhance tenants' *property* rights relative to owners of apartment buildings. Landlord-tenant law traditionally is fashioned to strike what a particular government thinks is the appropriate bargaining relationship between owners and renters, just as collective bargaining law strikes an analogous balance between companies and unions. Thus, had the statute absolutely barred landlords from evicting tenants without their consent in order to convert the building, or for that

matter for any other purpose so long as no unconstitutional taking was implicated (assuming, for example, fair rents were required[3]), I do not believe a serious constitutional question appears. *See Griffin Development Co. v. City of Oxnard*, 39 Cal. 3d 256, 217 Cal.Rptr. 1, 703 P.2d 339 (1985) (upholding regulations that effectively prohibited condominium conversion against a Fifth Amendment takings challenge); *Troy Ltd. v. Renna*, 727 F.2d 287 (3d Cir.1984) (upholding a statutory tenancy of forty years duration for senior citizens following a condominium conversion against a Fifth Amendment takings challenge).

The unconstitutional delegation issue arises apparently then only because *every* tenant is not granted a veto over a conversion plan that would lead to his or her eviction; instead a majority vote governs. Since these cases are thought to involve a deprivation of the rights of the property owner, it seems passing strange that the constitutional question arises because less power rather than greater is delegated to the tenants as a whole. I think it must follow that if every tenant could constitutionally be empowered to withhold consent to an owner's condominium conversion that would result in the tenant's eviction, then surely a majority can.

The three Supreme Court cases which seem so difficult to reconcile—and which troubled both the panel of this court and our colleagues across the street—are explainable in my view only if one focuses on the property interests which the ordinances furthered rather than the consent procedure employed.

1. *See Schad v. Mt. Ephraim*, 452 U.S. 61, 68, 101 S.Ct. 2176, 2182, 68 L.Ed.2d 671 (1981) (zoning ordinance); *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (same); *Silverman v. Barry*, 727 F.2d 1121, 1125–26 (D.C.Cir.1984) ("Supreme Court has not struck down a zoning ordinance on police power grounds since 1928"); *Grendel's Den, Inc. v. Goodwin*, 662 F.2d 88, 92 (1st Cir. 1981), *rev'd on other grounds sub nom. Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982) (zoning ordinance); *Eisen v. Eastman*, 421 F.2d 560, 567 (2d Cir.1969), *cert. denied*, 400 U.S. 841, 91 S.Ct. 82, 27 L.Ed.2d 75 (1970) (rent control); *see also* U.S. Const.

amend. X. *See generally* Note, *The Validity of Ordinances Limiting Condominium Conversion*, 78 Mich.L.Rev. 124, 128–32 (1979).

2. Of course, that is not to suggest that even if increasing rental stock were the District's sole objective the legislation would not pass the due process rational basis test, which limits the state's exercise of police power. *See Schad*, 452 U.S. at 68, 101 S.Ct. at 2182.

3. *See Penn Central Transp. v. City of New York*, 438 U.S. 104, 136, 98 S.Ct. 2646, 2665, 57 L.Ed. 2d 631 (1978) (no Fifth Amendment takings were reasonable return upon the land allowed).

In *Eubank v. City of Richmond*, 226 U.S. 137, 33 S.Ct. 76, 57 L.Ed. 156 (1912), the Supreme Court held unconstitutional a municipal ordinance that permitted two-thirds of the property owners on any block to establish a building line (between five and thirty feet) that would limit new construction between the line and the street because it was an excessive legislative delegation to those property owners. The Court thought that those property owners were thereby authorized to indulge only their "caprice" or "taste." *Id.* at 144, 33 S.Ct. at 77. According to the Court, no public policy interest was involved and implicitly, at least, the Court perceived no legitimate property interest protected or enhanced by the offending statute.

The Court zigged, however, when faced five years later with a Chicago ordinance that precluded construction of billboards on a residential block without consent of a majority of owners on the block. *Cusack Co. v. City of Chicago*, 242 U.S. 526, 37 S.Ct. 190, 61 L.Ed. 472 (1917). Although the Court relied on the distinction between initiation and veto to distinguish *Eubank*, *id.* at 531, 37 S.Ct. at 192, I think the unarticulated but key consideration that drove the Court's opinion is that a commercial billboard in a residential neighborhood would manifestly impair a homeowner's property value. The Supreme Court of Illinois, from which the appeal came, had relied, to sustain the ordinance (and presumably to avoid the impact of *Eubank*), on evidence that billboards induced an incredible array of immoral and unsanitary practices. The United States Supreme Court did note that a prohibition against the erection of billboards served the city's interest in "safety, morality, health and decency." But that ground to distinguish *Eubank* also seems quite unsatisfactory since, if billboards led to a breakdown in public morality, why would a majority of property owners be allowed to permit them on their block? I think one important difference between *Cusack* and *Eubank* is that in the earlier case the Court did not perceive any legitimate property interest in those who

wished the setback. In other words, the Court was unwilling to equate "taste" with dollars and cents. Erection of billboards in a residential block, by contrast, would result in a rather obvious diminution in the value of a homeowner's property.

In the third case in the trilogy, *Seattle Title Trust Co. v. Roberge*, 278 U.S. 116, 49 S.Ct. 50, 73 L.Ed. 210 (1928), the Court struck down a zoning ordinance that permitted philanthropic homes for children or old people in one of the six zoning districts of Seattle (the First Residence District—which appears in the opinion to have been an affluent area) only with a majority of the residence owners' consent. The ordinance, passed in 1925, was apparently designed to prevent the trustee from replacing an old building housing fourteen "aged poor" with a new one that could accommodate thirty. The Court relied on *Eubank*, distinguishing *Cusack* as not applicable because billboards were a "nuisance." *Id.* at 122, 49 S.Ct. at 52. By contrast, the Court saw nothing in the record in *Roberge* to show "any injury, inconvenience or annoyance to the ... district, or *any person*." *Id.* (emphasis added). I think the case stands for the limited proposition that a city cannot exclude "widows and orphans" from the high rent district totally without explanation and therefore has little to do—in reality—with the means used. It is really a forerunner of later equal protection cases, and under modern jurisprudence the statute would probably not pass the rational basis test. *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 448–50, 105 S.Ct. 3249, 3258–59, 87 L.Ed.2d 313 (1985).[4]

Because these cases all involve a procedure whereby a selected group casts a vote, either positively or negatively, I think the Court misleadingly treated them as if the voting process was constitutionally significant. Permitting a group of homeowners to vote on whether to allow new construction in their neighborhood suggests superficially a delegation to a sublegislature. *See Eastlake v. Forest City Enterprises*, 426 U.S. 668, 673–78, 96 S.Ct.

---

4. *See supra* note 2.

2358, 2362–64, 49 L.Ed.2d 132 (1976).[5] But, *Cusack* and *Roberge* I believe would have been decided the same way if any one of the homeowners had been given the power to stop the proposed action. Those cases really turn on whether the Supreme Court saw the local government recognizing and protecting what the Court thought a legitimate property interest. *Eubank*, on the other hand, is a true unconstitutional delegation case not because of the majority consent procedure but rather because until the majority of owners on the block fixed the property line there was no normative standard against which to judge the legality of proposed construction. *See also Carter v. Carter Coal Co.*, 298 U.S. 238, 311, 56 S.Ct. 855, 872–73, 80 L.Ed. 1160 (1936). If a city council were to instead, today—in an era when "taste" is at the core of much environmental legislation—bar new construction in a block closer than, say, twenty feet from the street, if a majority or any homeowners objected, I think such an ordinance would pass constitutional muster.

In sum, since the District's interest in enhancing the property rights of tenants cannot be said to be beyond its police power—in the way the mere "taste" of homeowners appeared in 1912—and since we are not faced with a failure of the District's Council to elaborate a legal norm, the tenant election section of D.C.'s Rental Housing Conversion and Sale Act of 1980, D.C. Code § 45–1612(i), is not an impermissible delegation of legislative power. The majority of tenants' approval procedure is not, in my view of independent constitutional significance.

---

**5.** It is true that in *Eastlake* the Supreme Court distinguished a referendum from a vote by a "narrow segment," 426 U.S. at 677, 96 S.Ct. at 2364, thus implying a continuing vitality to the *Eubank* rationale, but I think that was only because it was the most obvious ground to avoid *Eubank*.