David **HORNSTEIN**, et al., Appellants,

v.

Marion **BARRY**, et al., Appellees.

No. 83–242.

District of Columbia Court of Appeals.

Reargued en banc Sept. 7, 1988.
Decided June 20, 1989.

Burton A. Schwalb, with whom Laura A. Kumin and Patricia L. Maher, Washington, D.C., were on the brief, for appellants.

Lutz Alexander Prager, Asst. Deputy Corp. Counsel, with whom Frederick D. Cooke, Jr., Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellees.

Richard C. Eisen, Washington, D.C., with whom Eric M. Rome was on the brief, for amici curiae 2627 & 2633 Adams Mill Road Tenants Ass'n, et al.

Before MACK, NEWMAN, FERREN, BELSON, TERRY, STEADMAN and SCHWELB, Associate Judges, and REILLY and PRYOR,[*] Senior Judges.

## ON REHEARING EN BANC

SCHWELB, Associate Judge:

Appellants challenge the constitutionality of the District's Rental Housing Conversion and Sale Act, D.C.Code §§ 45–1601 *et seq.* (1986 and 1988 Supp.) (hereinafter the RHCSA or the Act). This statute provides in substance that an owner of rental housing may not convert it to condominium use unless fifty per cent of the eligible tenants consent to such conversion. We uphold the validity of the tenant consent requirement and reject the contention that it constitutes an improper delegation of legislative authority. We perceive little, if any, legal basis for the appellants' alternative conten-

---

[*] Judge Pryor was Chief Judge at the time of argument. He was commissioned as a senior judge on November 2, 1988.

tion that the Act, alone or in conjunction with the District's rent control laws, constitutes an unconstitutional uncompensated "taking." Nevertheless, we are constrained by the procedural posture of that issue to remand the case to the Superior Court for further proceedings.

## I

Appellants own the Savoy, a 203–unit apartment complex in northwest Washington. For many years, they have sought to convert the Savoy into a condominium. In May, 1981, they filed this action in the Superior Court against the Mayor and other District of Columbia officials (the District), alleging that the defendants had unlawfully denied their application for conversion, in violation of their statutory and constitutional rights. In January, 1983, Judge John F. Doyle granted the District's motion for summary judgment and dismissed all of the owners' claims.

The owners appealed to this court. On September 11, 1987, a three-judge panel affirmed Judge Doyle's dismissal of the owners' statutory claims, but held that the tenant consent requirement constitutes an improper delegation of legislative authority and deprives the owners of property without due process of law. The panel found that there was a genuine issue of material fact which precluded the entry of summary judgment as to the uncompensated taking claim and remanded for further development of that issue. *Hornstein v. Barry*, 530 A.2d 1177 (D.C.1987). On February 19, 1988, we granted the District's petition for rehearing *en banc* and vacated the panel opinion. 537 A.2d 1131 (D.C.1988).

As this case was proceeding towards resolution, similar contentions regarding the RHCSA were being considered a few

blocks away by our federal appellate colleagues. On May 3, 1988, in a suit brought by a different group of owners, a three-judge panel of the United States Court of Appeals dismissed a number of statutory and constitutional claims, some of them identical to those urged upon us in the present case. *Silverman v. Barry*, 269 U.S.App.D.C. 327, 845 F.2d 1072 (1988). That court explicitly declined to follow the reasoning or the decision of the panel of this court which had invalidated the tenant consent provisions. *Id.* at 341–42, 845 F.2d at 1086–87. On July 15, our federal colleagues, without a single dissenting vote, denied rehearing *en banc* in *Silverman*, 271 U.S.App.D.C. 179, 851 F.2d 434 (1988). On November 14, 1988, the Supreme Court denied *certiorari*. —— U.S. ——, 109 S.Ct. 394, 102 L.Ed.2d 383 (1988).

## II

The RHCSA forbids the conversion of a rental apartment complex into condominium units unless the Mayor certifies that a majority of the tenants qualified to vote[1] have consented. §§ 45–1611(a), 45–1612. The Act is the culmination of a long history of restrictions on conversion which is described in some detail in *Silverman, supra*, 269 U.S.App.D.C. at 330–32, 845 F.2d at 1075–77, and we need not repeat it here.[2] It is but one part of a comprehensive scheme of regulation[3] designed to protect the rights of tenants, particularly poor and elderly tenants who, in the Council's reasonable view, merit and need such protection.

In enacting the RHCSA, the Council made a number of findings, summarized below, in which it explained the need for the legislation. According to the Council, there exists a continuing housing crisis in

---

**1.** Qualifications for voting are governed by § 45–1612(d). Basically, a head of household may vote if he has lived in the accommodation at least 90 days before the election and is not and has not recently been an employee of the owner.

**2.** The owners' statutory claims are grounded in this history of restrictions and in the invalidation of one emergency measure in *District of Columbia v. Washington Home Ownership*

*Council, Inc.*, 415 A.2d 1349 (D.C.1980) (*en banc*). The panel effectively disposed of these statutory contentions in Part I of its opinion in this case. 530 A.2d at 1180–81. We adopt as our own this part of the vacated panel opinion and address the issue no further.

**3.** For other aspects of this regulatory scheme, *see, e.g.*, §§ 45–2501 (rent control); 45–2531 (tenant assistant); 45–2551 (eviction controls).

this city, with a severe shortage of rental housing and a low vacancy rate, particularly in relation to units which lower income tenants can afford. § 45–1601(2). The conversion of rental units to condominiums [4] or cooperatives depletes the rental housing stock. § 45–1601(3). Lower income tenants, particularly the elderly, feel the bite of this depletion most severely, for post-conversion costs are usually beyond their means, a condition which results in forced displacement, serious overcrowding, and disproportionally high housing costs. § 45–1601(4). Experience with prior conversion controls has demonstrated that such restrictions have not been sufficiently effective, and tenants who are most directly affected by conversion should be given a voice in the determination whether their rental housing should be converted. § 45–1601(7). The foregoing findings persuaded the Council that enactment of the RHCSA was required to preserve the public peace, health, safety and general welfare. § 45–1601(8).

In § 45–1602, the Council enumerated the purposes of the legislation, which parallel and complement the legislative findings summarized above. The Act was designed, among other things,

> [t]o discourage the displacement of tenants through conversion or sale of rental property, and to strengthen the bargaining position of tenants toward that end without unduly interfering with the rights of property owners to the due process of law.

§ 45–1602(1).

The comprehensiveness and specificity of the Council's findings compel us to conclude that the District confronted a serious problem which the Council had the right and duty to address. The question is whether the means by which the Council addressed it are constitutional.

## III

### A. *Presumption of Constitutionality.*

Our Constitution is the supreme law of the land, and at least since *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803), courts in this country have had the authority to invalidate legislation which contravenes its proscriptions. We do not, however, sit as a superlegislature to weigh the wisdom of statutory enactments. *Ferguson v. Skrupa*, 372 U.S. 726, 731, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93 (1963). A decent respect for the coordinate branches of government dictates that we exercise sparingly the power to strike down laws which have been duly passed by the elected representatives of the people. The Constitution presumes that even improvident legislative decisions will be rectified by the democratic process, and that "judicial intervention is generally unwarranted no matter how unwisely we may think that a political branch has acted." *Vance v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939, 943, 59 L.Ed.2d 171 (1979). The judiciary cannot encroach on the domain of the popularly elected branches without imperiling our most basic institutions. *Sinking Fund Cases*, 99 U.S. 700, 718, 25 L.Ed. 496, 504 (1878). Indeed, a court "usurps legislative functions when it presumes to adjudge a law void where the repugnancy between the law and the Constitution is not established beyond reasonable doubt." *National Maritime Union of America v. Herzog*, 78 F.Supp. 146, 155 (D.D.C.) (three judge court), *aff'd per curiam*, 334 U.S. 854, 68 S.Ct. 1529, 92 L.Ed. 1776 (1948).[5]

Laws adjusting the burdens and benefits of economic life come to the courts

---

4. To the purist who winces when Latin is misused, the plural of condominium is condominia.

5. The courts of this jurisdiction have also long adhered to the doctrine that statutes are not to be pronounced unconstitutional on the basis of "slight implication and vague conjecture," and that the opposition between the Constitution and law must be such "that the judge feels a clear and strong conclusion of their incompatibility with each other." *Thompson v. Riggs*, 6 D.C. 99, 111 (1864), *aff'd*, 72 U.S. (5 Wall.) 663 (1866). "Every possible presumption is in favor of the validity of a statute, and this continues until the contrary is shown beyond a reasonable doubt." *Bernardin v. Seymour*, 10 App.D.C. 294, 305 (1897), *aff'd sub nom. United States v. Duell*, 172 U.S. 576, 19 S.Ct. 286, 43 L.Ed. 559 (1899).

**534**

with a presumption of constitutionality, and one complaining of a due process violation must establish that the legislature acted in an arbitrary and irrational way. *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 16, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976). The elected branches have broad authority to determine the legislative facts on which a statute is based, and those challenging their judgment must convince the court that the legislative findings could not reasonably be conceived to be true by the governmental decisionmaker. *Vance v. Bradley, supra,* 440 U.S. at 111, 99 S.Ct. at 949. Only last term, the Supreme Court reaffirmed these principles with respect to the authority of states and their instrumentalities to regulate housing conditions in general and the landlord-tenant relationship in particular—the very kind of regulation at issue here. *Pennell v. City of San Jose,* 485 U.S. 1, ——, n. 6, 108 S.Ct. 849, 857–58 n. 6, 99 L.Ed.2d 1 (1988).

We emphasize that mere lip service to the presumption of constitutionality is insufficient, especially where, as in the present case, the legislation under attack addresses issues which are traditionally a proper subject for the exercise of the police power. Accordingly, the owners must make a very compelling showing indeed before this court may invalidate the RHCSA without impermissibly encroaching upon legislative prerogatives.

### B. *Delegation, Standardlessness, and Due Process.*

■ Although they acknowledge the applicability of the presumption of constitutionality, the owners contend that the tenant consent requirement impermissibly delegates legislative authority to private citi-

zens. They claim, in effect, that the RHCSA relegates their right to use their property as they see fit to the caprice of tenants who are free to act to promote their own private advantage rather than in the public interest. They argue that no standards are provided for the granting or withholding of consent, so that a majority of the tenants can bar conversion for a good reason, a capricious reason, a selfish reason, or no reason at all. This standardlessness, say the owners, renders the legislation unconstitutional and denies them property without due process of law.

It cannot be gainsaid that, under this statutory scheme, a tenant majority may act arbitrarily, and that there is no objective standard to which they must conform. Indeed, the Council, by making it an explicit purpose of the Act to strengthen the bargaining power of tenants,[6] undoubtedly recognized that the residents of a particular rental complex might well act in their own financial interest and consent to conversion only if the owners would sweeten the pie by buying them out at an attractive price. Where the residents of one complex agree to conversion in response to their landlord's financial largesse, their parochial interest in allowing the landlord to take the affected units off the rental market may collide with the needs of tenants city-wide and with the prime goal of the legislation, which is to avoid the erosion of affordable rental housing.

These criticisms of the Act may be thought plausible or persuasive, and perhaps the give and take of the political process has, in this instance as in others, produced less than perfect legislation. Perfection, however, is neither constitutionally required[7] nor practically achievable.[8] The

---

6. Another stated purpose of the legislation is "to encourage the formation of tenant organizations." § 45–1602(6).

7. "The demand for perfection must inevitably compromise with the hard facts of political life." *Vance v. Bradley, supra,* 440 U.S. at 108 n. 26, 99 S.Ct. at 948 n. 26.

8. Given the Council's stated purposes, we know of no flawless legislative solution that would achieve all of them. The Council could have made the ban on conversion absolute, *see Grif-*

*fin Development Co. v. City of Oxnard,* 39 Cal.3d 256, 217 Cal.Rptr. 1, 703 P.2d 339 (1985), but this would have placed further restrictions on the choices available both to owners and to their tenants. Another alternative would have been to fashion legislative standards, with the wishes of tenants being one factor, but the Council could reasonably conclude that this would have necessitated more administrative hearings, more bureaucracy, more litigation and more delay.

validity of this legislation must be considered in the context of the real world, warts and all, with its hard bargaining and legislative compromises, rather than by reference to some pristine utopia of a political theorist's wistful dreams. The Council, seeking both to protect the supply of available rental housing and to reinforce the bargaining power of tenants and their organizations, elected in this instance to prohibit conversion conditionally but not absolutely, and to temper that proscription by providing, in effect, for plebiscites in affected complexes. The Act permits tenants to dispense with the protection provided by the general ban on conversions if they can negotiate a better bargain for themselves. It may not be pretty, but we do not think it is unconstitutional.

■ Allowing a group of intended beneficiaries of legislation to waive its protection is not an impermissible delegation of legislative functions to private decisionmakers. "An otherwise valid regulation is not rendered invalid simply because those whom the regulation is designed to safeguard elect to forgo its protection." *New Motor Vehicle Board v. Orrin W. Fox Co.*, 439 U.S. 96, 109, 99 S.Ct. 403, 411, 58 L.Ed.2d 361 (1978), citing *Thomas Cusack Co. v. City of Chicago*, 242 U.S. 526, 37 S.Ct. 190, 61 L.Ed. 472 (1917). Where, as here, the City Council has made an appropriate finding that conversion to condominium use is presumptively contrary to the public interest and should be proscribed, it may constitutionally allow the primary beneficiaries of such a proscription to waive its benefits, even though this allows the units in question to be used in a manner which would otherwise be impermissible. *Cusack, supra.* Although such an arrangement countenances some private sovereignty over the fate of others and a concomitant lack of standards, the due process clause is not thereby transgressed.

*Cusack*, on which Judge Doyle relied in this case in granting judgment for the District, upheld an ordinance prohibiting construction of billboards in residential areas without the consent of a majority of property owners in the affected blocks. The Court held that the City had not impermissibly delegated its legislative authority to private citizens by permitting the prohibition against erection "to be modified with the consent of the persons who are most affected by such modification." *Id.* at 531, 37 S.Ct. at 192. Rather than being put at a disadvantage, the Court noted, the billboard manufacturer "obviously may be benefited by this provision, for without it the prohibition of the erection of such billboards in such residence section is absolute. He who is not injured by the operation of a law or ordinance cannot be said to be deprived by it of either constitutional right or of property." *Id.* at 530, 37 S.Ct. at 191.[9]

Of course, before private persons may legislatively acquire any say with respect to property belonging to others, the legislative regulation must itself be "otherwise valid" in the sense that its provisions must serve a legitimate governmental function.

---

9. We think that in the present case the tenant consent provision, like its functional counterpart in *Cusack*, probably inures to the benefit of the owners rather than to their disadvantage. The RHCSA contains a very broad severability clause, § 45–1663, which directs that if any "provision, section, clause, phrase or word" is held invalid, the remainder of the Act shall not be affected. *See also Gary v. United States*, 499 A.2d 815, 821 (D.C.1985) (*en banc*), *cert. denied sub nom. Cole v. United States*, 475 U.S. 1086, 106 S.Ct. 1470, 89 L.Ed.2d 725 (1986) and authorities there cited (discussing presumption of severability). A consideration of the Council's findings and statement of purposes, as well as the legislative history of the Act, *see* Commission on Housing & Economic Development, Council of the District of Columbia, Report on Bill 322 (May 13, 1980), strongly suggests that if the Council had been compelled to elect between an outright ban on conversion and a scheme which would permit such action even without the consent of the tenants, it would probably have chosen the former as a means of dealing with the unrelenting housing crisis. Given this analysis, the question arises whether the owners have standing to complain of the tenant consent requirement since, if that requirement were eliminated, the restrictions on the owners would be even more severe. Actual or threatened injury in fact is, of course, indispensable to standing. *Warth v. Seldin*, 422 U.S. 490, 498–501, 95 S.Ct. 2197, 2204–06, 42 L.Ed.2d 343 (1975). This issue not having been expressly raised by the District, however, we rest our decision on other grounds.

*See Silverman v. Barry, supra,* 845 F.2d at 1086. *Seattle Trust Co. v. Roberge,* 278 U.S. 116, 49 S.Ct. 50, 73 L.Ed. 210 (1928), on which the owners rely, is distinguishable both from *Cusack* and from the present case because the regulation there invalidated served no such permissible purpose. In *Roberge,* a zoning ordinance permitted establishment of "philanthropic home[s] for children or old people" only with the consent of two-thirds of the adjoining landowners. *Id.* 278 U.S. at 118, 49 S.Ct. at 50. In holding the ordinance unconstitutional, the Court emphasized that there had been no legislative determination that the proposed building and use would be inconsistent with public health, safety, morals or general welfare. *Id.* at 121, 49 S.Ct. at 51. The Court distinguished *Cusack* on the grounds that the legislative facts there found were "sufficient to warrant the conclusion that such billboards would or were liable to endanger the safety and decency of such districts." *Id.* 278 U.S. at 122, 49 S.Ct. at 52. By contrast, there was no finding in *Roberge* that a home for the aged "is liable to work any injury, inconvenience or annoyance to the community, the district, or any person." *Id.* The present case is like *Cusack* and unlike *Ro-*

*berge,* for the Council has spelled out in detail the dangers to the public peace, health, safety, and welfare which the RHCSA was designed to address.

The distinction between *Cusack* on the one hand and *Roberge* and *Eubank v. City of Richmond,* 226 U.S. 137, 33 S.Ct. 76, 57 L.Ed. 156 (1912) [10] on the other has precipitated some judicial [11] and other [12] criticism. We agree with our federal brethren in *Silverman,* however, that the *Eubank–Cusack–Roberge* trilogy presents a coherent set of principles sufficient to sustain the RHCSA. [13] In any event, more than half a century has passed since the Supreme Court last struck down, on due process grounds, a statute delegating Congressional authority, *see Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935); *Panama Refining Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935), and we perceive little basis for concluding that the analysis in *Cusack* [14] will, or should, be abandoned. Given the presumption of constitutionality, the view of the United States Court of Appeals that the Act is constitutional, [15] and the continuing viability of *Cu-*

10. In *Eubank,* which was decided before *Cusack,* the Court struck down as fatally lacking in standards an ordinance which directed a municipal agency to prohibit construction of buildings beyond a certain line if two thirds of the abutting landowners requested it.

11. *See, e.g.,* the panel decision in the present case, 530 A.2d at 1183; *Drovers Trust & Savings Bank v. City of Chicago,* 18 Ill.2d 476, 478, 165 N.E.2d 314, 315 (1960).

12. *See, e.g.,* Note, *The Validity of Ordinances Limiting Condominium Conversions,* 78 Mich.L. Rev. 124 (1979). Drawing upon a level of certitude as to who knows best which is often directly proportional to youth but inversely proportional to experience, the student editors allude contemptuously to the "fatuousness" of a distinction which the Supreme Court justices almost unanimously found persuasive. *Id.* at 137–38.

13. As the court explained in *Silverman, supra,* 269 U.S.App.D.C. at 341, 845 F.2d at 1086:

In order for a legislative delegation to private citizens to survive a due process challenge, the Court instructs that two criteria must be satisfied. First, the underlying exercise of authority must be a reasonable regulation

within the power of the government. *Cusack,* 242 U.S. at 528, 37 S.Ct. at 190. Second, the legislature's restriction must be in the form of a general prohibition, and the delegation must be in the form of permitting private citizens to waive the protection of that prohibition. *Id.* at 531, 37 S.Ct. at 192....

The court held, and we agree, that the RHCSA meets each prong of this test because "[t]he interest of a municipality in the conversion of its apparent stock to condominiums and cooperatives cannot be gainsaid," and because "[i]ts tenant election provision is phrased as a blanket prohibition that can be overcome through a tenant election." *Id.* at 342, 845 F.2d at 1087. *Cf.* opinion of Silberman, J., concurring in the denial of rehearing in *Silverman,* 271 U.S.App. D.C. at 179, 851 F.2d at 434.

14. Both *New Motor Vehicle Board v. Orrin W. Fox Co., supra* and *Eastlake v. Forest City Enterprises, Inc.,* 426 U.S. 668, 677–78 n. 12, 96 S.Ct. 2358, 2364 n. 12, 49 L.Ed.2d 132 (1976) suggest that *Cusack* is alive and well.

15. Although only a decision of the Supreme Court of the United States is binding on us, even with respect to a federal constitutional issue, we believe that we should treat *Silverman* as per-

*sack,* we find no due process violation in the RHCSA.

## C. *Uncompensated Taking.*

The owners claim that by enacting the RHCSA and the rent control laws, and by effecting "delays through the use of illegal ordinances," the District has taken their property for public use without just compensation, in violation of the Fifth Amendment. Judge Doyle's order granting the District summary judgment did not explicitly address this issue. The panel found dismissal of the taking claim on the pleadings to be premature, because resolution of the issue requires an "essentially *ad hoc* factual inquiry." 530 A.2d at 1185, *citing Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 426, 102 S.Ct. 3164, 3171, 73 L.Ed.2d 868 (1983). Although our emphasis differs from the panel's, we agree that a remand is required.

■ To prove a taking under the Fifth Amendment, it is not necessary to demonstrate that the property was "taken" in the narrow sense of the word, nor need the government have directly appropriated the title, possession, or use of the property. *Richmond Elks Hall Assn. v. Richmond Redevelopment Agency,* 561 F.2d 1327, 1330 (9th Cir.1977). A land use regulation effects a taking if it denies an owner any economically viable use of his land. *Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980); *Nollan v. California Coastal Com'n,* 483 U.S. 825, 833–34, 107 S.Ct. 3141, 3146, 97 L.Ed.2d 677 (1987). The just compensation clause does not, however, require that a landowner be permitted to make the most profitable use of his property. Quite the contrary, diminution in property value, standing alone, does not establish a taking, especially where the property is capable of earning a reasonable return within the governmental restrictions. *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 129, 131, 98 S.Ct. 2646, 2661, 2662, 57

L.Ed.2d 631 (1978); *see Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 495–96, 107 S.Ct. 1232, 1247, 94 L.Ed. 2d 472 (1987); *900 G Street Assoc. v. Dept. of Housing,* 430 A.2d 1387, 1390–91 (D.C. 1981).

■ These principles have been applied to situations similar to the one that confronts us here. In *Griffin Development Co. v. City of Oxnard, supra,* the Supreme Court of California upheld, against a Fifth Amendment challenge, a regulation which effectively prohibited condominium conversion. The court noted that the owner was "free to continue to rent its apartments, unaffected by the ordinance; the regulations apply only to its plans to convert the apartments to condominiums." 39 Cal.3d at 259, 217 Cal.Rptr. at 1, 703 P.2d at 344–45. The court observed that most land use regulations have the effect of reducing the value of regulated properties, but concluded that even a significant diminution in value is insufficient to establish a prohibited taking. *Id.* at 2, 217 Cal.Rptr. at 260, 703 P.2d at 345. *See also Troy Ltd. v. Renna,* 727 F.2d 287, 300–02 (3d Cir.1984) (upholding a forty-year statutory tenancy for senior citizens following condominium conversion against contention that it constituted an uncompensated taking in violation of Fifth Amendment), and the opinion of Silberman, J., concurring in the denial of rehearing in *Silverman, supra,* 271 U.S. App.D.C. at 180, 851 F.2d at 435.

In the present case, as in *Griffin, supra,* the owners are free to continue to use the Savoy as rental property. They complain in conclusory fashion that the District's rent control laws promote expropriation, but the Supreme Court declined, only last term, to reconsider *Block v. Hirsh,* 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865 (1921) and its progeny, upholding the constitutionality of rent control. *Pennell, supra,* 485 U.S. at ——, 108 S.Ct. at 857–58 n. 6. Moreover, the District permits a landlord to file a hardship petition and obtain an up-

suasive authority both on the basis of its reasoning and in the interest of harmony between court systems and uniformity of result in the same geographical area. *See State v. Knowles,*

371 A.2d 624, 627–28 (Me.1977); *Littlefield v. State Dept. of Human Services,* 480 A.2d 731, 737 (Me.1984).

ward adjustment of the rent if his rate of return has been less than 12% per year, § 45–2522, a provision which appears to make the law anything but confiscatory. Given these circumstances, as well as the presumption of constitutionality, the difficulties with the owners' contention that the District has taken their property without compensation may not be easy to surmount.

■ We conclude, however, that the procedural posture of the litigation precludes its final disposition on this appeal. The case came before Judge Doyle on the District's motion for summary judgment. The District's statement, pursuant to Super.Ct. Civ.R. 12–I(k), of material facts as to which there was alleged to be no genuine issue, focused entirely on the owners' statutory claims, and did not address the factual context of the issue of uncompensated taking. The owners' statement of what they claimed to be genuine disputed issues of material fact, filed in response to the motion and in compliance with the same Rule, also addressed the statutory claims alone. Accordingly, the record as to uncompensated taking is deficient, which is problematical in a situation in which, as the panel noted, an *ad hoc* case by case inquiry is called for.

The District contends, and we agree, that the owners bear the burden of proof to establish an unconstitutional taking. The District goes on to argue that the owners, having access to the relevant evidence, presented nothing to the trial court which would demonstrate the unavailability of alternative economic uses for the property. The owners having failed to establish that material facts were at issue, says the District, summary judgment followed "as a matter of course."

The problem with the District's argument, however, is that although the owners bear the ultimate burden with respect to the substantive issue, the party seeking summary judgment has the burden of showing that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Super.Ct.Civ.R. 56(c). In the present posture of the case, with the District's Rule 12–I(k) statement devoted to other matters, we apprehend that the owners were not fully and fairly put on notice that they were required to submit affidavits or other materials from which the court might find that a genuine issue of material fact exists. For all practical purposes, they were given no factual material to which to respond.

Accordingly, in order to ensure that the owners do not forfeit a constitutional claim as a result of a procedural focus by both sides on other matters, we remand the case to the Superior Court for further proceedings with respect to the uncompensated taking claim. In light of the possibility that this claim lacks substance, we suggest, but do not require, that in lieu of proceeding to trial, the parties be permitted to supplement their submissions in support of and in opposition to the motion for summary judgment and to provide affidavits or other materials relevant to the question whether there was an unconstitutional taking. Further consideration may be given to that motion after this has been accomplished.

## IV

The judgment is affirmed with respect to the owners' statutory and due process claims. The case is remanded to the Superior Court for further proceedings consistent with this opinion with respect to the uncompensated taking claim.

*So ordered.*

NEWMAN, Associate Judge, concurring in part and dissenting in part:

I join in so much of the judgment of the court as holds constitutionally valid the tenant consent part of the statute. I dissent from the remand on the "taking" issue. Given the fact that Hornstein's complaint did not allege an unconstitutional uncompensated taking (as distinguished from the tenant consent issue) it is not surprising to me that the District did not move for summary judgment on that question. In his opposition to summary judgment, Hornstein never raised this as an issue. Thus, it

is not surprising to me, in this context, that the trial court did not consider as an issue something that no party raised by pleading or otherwise. I am unable to join my colleagues in ruling that this was error by the trial court.

FERREN, Associate Judge, with whom TERRY, Associate Judge, joins, concurring and dissenting:

I concur in Part III C ("Uncompensated Taking") of the opinion for the court, but I respectfully dissent from Part III B ("Delegation, Standardlessness, and Due Process") for the reasons set forth in Part II of the vacated opinion of the division, *Hornstein v. Barry*, 530 A.2d 1177, 1181–85 (D.C.1987). I add only a few comments.

I.

The majority opinion states that the Council of the District of Columbia "could have made the ban on conversion [to condominiums] absolute," *ante* at 534 n. 8, without violating due process. The court implies that this constitutional power to prohibit all conversion necessarily includes the power to impose a less absolute ban.[1] The court then holds that the Council may do so by delegating to private tenant groups— the "primary beneficiaries" of the legislation, *ante* at 535—the government's power to make exceptions to the ban, and that the tenants of a particular complex may elect conversion by reference not to legislative guidelines but to their own arbitrary, "parochial" interests. *Ante* at 534. There are two problems here: (1) the "greater-includes-the-lesser" argument and (2) the delegation issue.

A.

In *City of Lakewood v. Plain Dealer Publishing Co.*, — U.S. — 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988), the Supreme Court sustained a facial challenge to the validity of a local ordinance authorizing the mayor to grant or deny publishers' applications for annual permits to place newsracks on public property. Among its rulings, the

Court held that, even if the municipality could ban newsracks entirely from the public sidewalks under the "well-settled time, place, and manner test," it could not, consistent with the first amendment, use the licensing scheme at issue to permit some but not others on the sidewalks. *Id.* 108 S.Ct. at 2147. The Court reasoned that a licensing official's "boundless discretion," necessarily "raises the specter of content and viewpoint censorship," an altogether different concern from the one "animating our test to determine whether an expressive activity may be banned entirely." *Id.* Concededly, first amendment jurisprudence is unique; but, the Court's reasoned refusal to use the power to ban entirely as the basis for implying a power to ban less restrictively is informative nonetheless. The Court makes clear that the constitutional concerns underlying a complete prohibition may differ from those underlying a particular, conditional prohibition—and thus may lead to different results when the respective prohibitions are challenged.

In contrast, in *Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986), the Supreme Court rejected a first amendment challenge to a ban on advertising casino gambling, even though gambling itself was lawful. The Court reasoned that, because gambling is not a constitutionally protected activity, "the greater power to completely ban casino gambling necessarily includes the lesser power to ban advertising of casino gambling...." *Id.* at 345–46, 106 S.Ct. at 2979. Inherent in the Court's reasoning was a premise that distinguishes *Posadas* from *City of Lakewood:* "[T]he less intrusive step of allowing the conduct, but reducing the demand through restrictions on advertising," does not suggest constitutional concerns any different from those that would be used to test a "wholesale prohibition" of gambling. *Id.* at 346, 106 S.Ct. at 2979.

The present case is like *Posadas* in that the policy and constitutional concerns underlying absolute and conditional bans, as

---

1. *See also Silverman v. Barry*, 271 U.S.App.D.C. 179, 851 F.2d 434, *cert. denied,* — U.S. —, 109

S.Ct. 394, 102 L.Ed.2d 383 (1988) (Silberman, J., *concurring in the denial of rehearing en banc* ).

such, on condominium conversions are the same: preservation of an appropriate supply of rental housing consistent with each landlord's right to a fair rate of return on the property. But this case is like *City of Lakewood* in that the means chosen to implement the particular conditional ban here injects a constitutional issue not present in an absolute ban: delegation of governmental power to private groups. It follows, therefore, that the Council's power to ban condominium conversions entirely, while generally implying the power to impose a lesser, conditional ban, does not necessarily imply, in addition, a power to achieve that more limited approach by handing over governmental power to private groups to make the sundry exceptions to the ban. The suggestion that the greater power includes the lesser, therefore, does not contribute very much to the discussion in the context with which we deal here.

### B.

I turn to the delegation issue. The en banc majority acknowledges that a tenant majority, in approving or disapproving such conversion, "may act arbitrarily, and there is no objective standard to which they must conform." *Ante* at 534. The tenants, say my colleagues, may "act in their own financial interest and consent to conversion only if the owners would sweeten the pie by buying them out at an attractive price." *Ante* at 534. Indeed, "their parochial interest in allowing the landlord to take the affected units off the rental market may collide with the needs of tenants city-wide and with the prime goal of the legislation, which is to avoid the erosion of affordable rental housing." *Ante* at 534. In short, the en banc majority acknowledges that the statutory scheme is not calibrated in a way that assures a virtual congruence between the collective private interests of tenant majorities and the public's interest in having the most beneficial possible mix of housing for the community, present and future. Indeed, the court sustains the statute against constitutional attack while candidly acknowledging that the required consent provision institutionalizes a shakedown scheme—pressure to "sweeten the pie," *ante* at 534—for the private financial benefit of incumbent tenants, not necessarily for the overall benefit of the community of tenants-at-large. I cannot agree.

I do not believe the government constitutionally may empower self-interested tenant majorities to make governmental decisions that "arbitrarily" determine landlords' property rights, as well as the interests of tenant minorities. If exceptions to a governmental policy banning condominium conversion are to be made, then in my view, to comport with due process, a governmental body—not a wholly private group—must make those decisions and must do so with reference not to "parochial" interests but to adequate legislative guidelines reflecting the public interest. *See Washington ex rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116, 122, 49 S.Ct. 50, 52, 73 L.Ed. 210 (1928).

The Supreme Court itself has limited the opinion on which the majority primarily relies, *Cusack Co. v. City of Chicago*, 242 U.S. 526, 37 S.Ct. 190, 61 L.Ed. 472 (1917), to private waivers of bans on localized "nuisances" by the residents primarily affected. *See Roberge*, 278 U.S. at 122, 49 S.Ct. at 52. Because of the due process implications of "parochial" and "arbitrary" decision-making by purely private tenant groups ultimately affecting the nature of the housing stock available citywide, I believe *Cusack* is inapposite here.

If this were merely a matter, as in *Cusack*, of the only affected residents waiving supposedly beneficial legislation, then the en banc majority's argument might have force. But, in this case, the Council has granted such waiver authority to private groups who collectively wield substantial governmental power having citywide impact on the housing stock available not only to incumbent tenants but also to prospective tenants. It is one thing for a group of neighbors to waive a prohibition of a billboard on a city block that presumably affects only them; it is another when a group of tenant neighbors waives a ban on conversions of rental property to condominiums that ultimately affects other people. In the latter situation we face here,

there is not only an impact well beyond the tenants' own immediate situations but also a result not demonstrably synchronized with the public's overall housing needs.

In sum, under the statute at issue here, the en banc majority upholds a "standard-less delegation of power"[2] over property rights to a "narrow segment of the community"[3] in violation of the due process rights of landlords and dissenting tenants. I cannot join in that result.

## II.

The legislation here, if struck down, would not necessarily leave without a remedy those tenants who, as a community, oppose condominium conversion in individual instances or altogether. If the Council does not want to impose a complete ban, there is no reason why an existing or newly-created governmental agency could not be charged with monitoring the rental housing stock available to tenants of low, moderate, and high income, respectively, and authorized to approve or reject all proposed conversions to condominiums. The agency could be required, as part of that process, to consider local and citywide tenant views, as well as the views of the landlords and others, on all proposed conversions. The majority is concerned about the inefficiency of such an alternative, *ante* at 534 n. 8, but this is the administrative law approach we traditionally require—with good reason—if the government is to regulate property rights consistent with the interests of all persons affected. *See, e.g.,* D.C.Code § 25–115(a)(6) (1981) (Alcoholic Beverage Control Board shall be satisfied that place for which license is to be issued is an appropriate one considering, among other things, "the wishes of the persons residing or owning property in the neighborhood").

REILLY, Senior Judge, dissenting in part:

Despite the scholarly tone of the majority opinion which overrules the conclusion we reached when our division first considered the issue, *see Hornstein v. Barry,* 530 A.2d 1177 (D.C.1987), the reasons it advances for upholding the constitutionality of the challenged provision of the Act are at odds with the controlling holdings of the Supreme Court. With all deference to my colleagues, I discern nothing in its text which persuades me that we were wrong in concluding that the Supreme Court has drawn the line against any land-use restriction conditioned upon the votes of a narrow segment of the community affected.

Stripped of its nonessentials like the lengthy discourse on the duty of judges to refrain from invalidating federal and local statutes, irrespective of reservations concerning the wisdom of the particular enactment unless it is clearly unconstitutional[1]—a principle of judicial restraint of which we are thoroughly aware—the thrust of the majority opinion is that because the District Council had authority to pass an act completely prohibiting the conversion of rental units into condominia, it was also within the authority to exempt from the general prohibition any apartment complex where a majority of the tenants vote to accept the proposed conversion. In arriving at this conclusion, the majority opinion leans heavily upon a recent decision of a panel of the United States Court of Appeals for the District of Columbia, *Silverman v. Barry,* 269 U.S.App.D.C. 327, 341, 845 F.2d 1072, 1086, *cert. denied,* —— U.S. ——, 109 S.Ct. 394, 102 L.Ed.2d 383 (1988), asserting that a legislative delegation to a group of private citizens is not offensive to the due process clause if (1) such regulation is within the power of the government to adopt, (2) is expressed in the form of a general prohibition, and (3) the

---

**2.** *City of Eastlake v. Forest City Enterprises, Inc.,* 426 U.S. 668, 678, 96 S.Ct. 2358, 2364, 49 L.Ed. 2d 132 (1976).

**3.** *Id.* at 677, 96 S.Ct. at 2364 (emphasis omitted).

**1.** The opinion fails to point out that where the Supreme Court has pronounced as repugnant to

the due process clause similar and indistinguishable provisions in statutes passed in other states, courts in this jurisdiction are under an obligation to defer to such pronouncements when the validity of a local statute is drawn into issue, irrespective of its public popularity.

delegation is "in the form of permitting private citizens to waive the protection of that prohibition."[2]

In my view, the basic premise that an absolute prohibition of condominium conversion is within the power of our local government to enact rests upon shaky grounds. Only one judicial authority is cited by the majority for that proposition: a decision of the California Supreme Court,[3] a somewhat dubious source for guidance on questions of constitutional law. Such legislation as Judge Silberman noted in his *Silverman* concurrence might be questionable as tending over time to reduce the supply of rental units, because anti-condominium legislation, like rent control laws, creates a powerful disincentive to the construction of new rental apartment buildings.[4] In any event, as such a statute is not before us, it is scarcely within our province to pass upon its constitutionality.

The real fallacy of this rationale, however, is that even though a general prohibition of conversions to condominia might survive a due process challenge, the tenant election provision would be enough to render such a statute unconstitutional.

In my view, the basic reliance of the circuit court and the majority opinion upon *Thomas Cusack Co. v. City of Chicago*, 242 U.S. 526, 37 S.Ct. 190, 61 L.Ed. 472 (1917), is badly misplaced. It was not *Cusack*, but *Washington ex rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116, 49 S.Ct. 50, 73 L.Ed. 210 (1928) whose controlling

precedential weight was reaffirmed by the recent *Eastlake* opinion, and it is to the latter case that this court should look in deciding the delegation issue.[5]

In *Roberge*, as we pointed out in the panel opinion, 530 A.2d at 1183, the Supreme Court struck down an *amendment* to a general zoning ordinance, which revision allowed the operation of a philanthropic home for children and the elderly, provided the owners of two-thirds of the property in an adjacent area gave their written consent, on the ground that such an "arbitrary" (*i.e.*, standardless) delegation of power was repugnant to the due process clause. Opponents of the philanthropic home also made the same argument the majority accepts as valid, *viz.*, that as the original zoning plan had not permitted such semi-public institutions charitable homes for the elderly in this particular residential district, the ordinance without the offending amendment should be allowed to stand. The Court responded, 278 U.S. at 123, 49 S.Ct. at 52:

> We need not decide whether, consistently with the Fourteenth Amendment, it is within the power of the state or municipality by a general zoning law to exclude the proposed new home from a district, defined as is the first district in the ordinance under consideration.

In short, what the *Roberge* Court held was that even though a municipality might have authority to pass a law restricting a particular district to purely private residential use, a waiver provision which could

---

2. We note in passing that this is the first time since *Swain v. Pressley*, 430 U.S. 372, 97 S.Ct. 1224, 51 L.Ed.2d 411 (1977), that the circuit court has refused to defer to our court on the construction of local statutes or the application of common law principles. *See Kropinski v. World Plan Executive Council–U.S.*, 272 U.S.App. D.C. 17, 22, 853 F.2d 948, 953 (1988); *Keener v. WMATA*, 255 U.S.App.D.C. 148, 153, 800 F.2d 1173, 1178 (1986) (and cases cited therein); *Hall v. C & P Telephone Co.*, 253 U.S.App.D.C. 368, 793 F.2d 1354 (1986). That the litigation raises federal constitutional issues is immaterial. *See Swain, supra*, 430 U.S. at 383 n. 10, 97 S.Ct. at 1228 n. 10.

3. *Griffith Development Co v. City of Oxnard*, 39 Cal.3d 256, 217 Cal.Rptr. 1, 703 P.2d 339 (1985).

4. The Council, apparently recognizing that its laws intended to prevent erosion of the supply of rental units was having the opposite effect and would deprive the District of federal housing subsidies, has recently enacted legislation exempting new construction from its current rent control laws, which include the restrictions on condominium conversion. *See Seman v. D.C. Rental Housing Comm'n*, 552 A.2d 863 (D.C.1989).

5. *City of Eastlake v. Forest City Enterprises, Inc.*, 426 U.S. 668, 96 S.Ct. 2358, 49 L.Ed.2d 132 (1976). The majority also relies upon a dictum in *New Motor Vehicle Board of California v. Fox*, 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978), without coming to grips with the reasons we regarded that case as irrelevant to the issue before us.

be invoked only by a small segment of voters made the presumed validity of a general prohibition irrelevant. *See Eastlake, supra* (establishing the doctrine that if a land use restriction dependent on some sort of referendum is valid, it must *be* a referendum in which all qualified registered voters in the city may participate).

Apparently refusing to concede our point that a referendum limited only to a small segment of the community can be upheld only when the legislation is directed at some kind of nuisance, *e.g.,* unsightly billboards, the majority contends that because the tenant election process here was expressly intended to confer greater bargaining power on the occupants of the rental units and to encourage the formation of tenant organizations for negotiating purposes, such Council findings justify a delegation of legislative power to a narrow group for whose protection the statute was enacted.[6] The challenged provision, however, goes far beyond conferring reasonable bargaining power on the favored few in electorates thus limited. It grants them an absolute power of veto, and thus cannot be equated with statutes like the National Labor Relations Act which confer collective bargaining powers on workers. That statute, in order to insure that the delegation of such power could pass constitutional muster, provides that "the obligation [to bargain] does not compel either party to agree to a proposal or require the making of a concession." 29 U.S.C. § 158(d) (1982).

The majority candidly notes that, under the challenged statutory scheme, a majority of tenants in a particular complex may bar conversion for purely arbitrary or capricious reasons, or may agree to it, only because the financial offer of the landlords to buy them out appeals to selfish reasons. It then concedes that such parochial reasons for responding to their landlord's largesse "may collide with the needs of tenants city wide and with the prime goal of legislation, which is to avoid the erosion of affordable rental housing."

I submit that this aspect of the legislation conclusively demonstrates that the challenged provision flies in the face of the *Eastlake* test. What it reveals is not a mere imperfection, but rather a fatal defect in the challenged legislative scheme.

So far as the separate issue of an unconstitutional taking without compensation is concerned, I also believe that in this posture of the case a remand for the purpose of an evidentiary proceeding is required. Although the petitioners for rehearing dispute this part of the order entered by the panel, it is plain that this argument is premature under the holding of the Supreme Court in *Pennell v. City of San Jose,* 485 U.S. 1, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988). I see no reason for the extended comments of the majority on this issue, which are almost tantamount to an advisory opinion against plaintiff. Surely cases like *Nollan v. California Coastal Commission,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), which vindicated the rights of thalatarian landholders to exclusive access to their shore property in the absence of compensation for a public easement, show that the issue is anything but frivolous.

---

6. The opinion also notes that the Council was properly concerned with protecting the rights of tenants, "particularly poor and elderly tenants, who ... merit and need such protection." It should be observed, however, that the chal-lenged legislative scheme is not limited to poor or elderly tenants, but also applies to high rent apartments inhabited by well-to-do persons whose tenure in the particular building may be for reasons of only temporary convenience.